FRED W. GRAVENHORST, Respondent, *v.* LEOPOLD ZIM-
MERMAN et al., Composing the Firm of ZIMMERMAN
& FORSHAY, Appellants.

**Trial — when summary judgment improper — rescission —
when question for a jury as to whether contract was rescinded
— when agreement to transmit credit to foreign country an
executory contract — interpretation of contract — custom —
evidence of custom not permitted for purpose of contradicting
agreement or accomplishing unfair construction of contract —
summary judgment — letter of rescission cannot be made
basis of summary judgment where followed by further nego-
tiations and a delay of three years.**

1. If defendants make it appear that under any one of several
defenses a genuine and substantial issue is created they are entitled
to a trial in the regular order and a summary judgment is improper.

2. Rescission may be a matter of acts as well as of words. Formal
notice of cancellation of a contract may be utterly counteracted and
overborne by subsequent recognition of it as an existing obligation.
A party cannot by words cancel his contract and then continue to
assert rights and benefits and negotiate under it.

3. Where a banker in consideration of a sum of money paid to
him contracts to create a credit for a given person of a given amount
of a desired foreign money at a given place through orders dispatched
by wireless and confirmed by mail to somebody who will obey his
directions in setting up the credit, his contract when he makes it is
not an executed act but an executory agreement. Distinction
between a transaction in foreign exchange and purchase of a draft
or bill of exchange pointed out.

4. Clauses in a memorandum, delivered by defendants to plaintiff's
assignor, providing that the defendants shall not be liable " for
delayed payment or non-payment * * * caused by any delay
or error on the part of the cable company in the transmission or the
delivery of the message ordering the payment," interpreted in the
light of other provisions in the memorandum and of the entire
transaction, are applicable only to an ordinary case of delay or error
and not sufficient to cover an instance of total suspension of tele-
graphic and mail communications.

5. An alleged custom that the wireless system and the post office
service are the agents of the customer and not of the banker; that the
latter discharges his full duty when he delivers his wireless message
and confirmatory letter; that he has no responsibility for their

transmission and does not place himself under any obligation to carry out his contract except that in a case of delay or non-delivery he will pay to the customer the same rate of interest as is allowed by his correspondent, is in contradiction of the contract between the parties.

6. Evidence of custom is permitted for the purpose of qualifying the meaning of a contract where otherwise ambiguous and of providing for incidents not in contradiction of the fundamental provisions of the contract and of supplying omissions under certain circumstances which have occurred in the agreement of the parties. Such evidence is not permitted for the purpose of contradicting the agreements which the parties have made or for the purpose of accomplishing an unfair or immoral construction of their contract.

7. Upon the motion for summary judgment in this action to recover moneys paid to defendants in 1917 in consideration of an agreement by them to transfer a certain sum in marks to the account of a designated payee in Berlin, plaintiff claiming that the contract was executory and had been rescinded because of failure of defendants to comply therewith, nothing has been presented indicative of any evidence which would have permitted a jury to find that the contract made between the parties was modified by one to the effect that defendants were to hold the marks for the establishment of a credit for which plaintiff's assignor paid, until the credit could be established, with an allowance of interest at the rate allowed by defendants' correspondent.

8. So far as concerns the nature of the contract and the general principles governing the subject of rescission no bar is presented to plaintiff's recovery, but it cannot be said that rescission was so conclusively effected that the trial judge had the right to say that there was no substantial issue and that summary judgment should be granted, where a letter depended upon to effect the rescission was followed by much correspondence and delay in which each side urged its views, in which the defendants made explanations, assertions and promises and in addition to everything else the assignor reacted with a delay of over three years from the date of the alleged rescission. Under these circumstances defendants were entitled to have the issue deliberately tried and their right to be heard in the usual manner of a trial protected.

*Gravenhorst* v. *Zimmerman*, 202 App. Div. 819, reversed.

(Argued March 19, 1923; decided May 1, 1923.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the second judicial

department, entered July 6, 1922, unanimously affirming a judgment in favor of plaintiff entered upon an order of Special Term granting a motion for summary judgment.

*Osmond K. Fraenkel* and *Louis Werner* for appellants. There has been no failure of consideration which entitles plaintiff to rescind. (*American Express Co.* v. *Cosmopolitan Trust Co.*, 239 Mass. 249; *Foreign Trade Banking Corp.* v. *Cosmopolitan Trust Co.*, 134 N. E. Rep. 403; *Suse* v. *Pompe*, 8 C. B. [N. S.] 538; *Matter of Bolognesi*, 254 Fed. Rep. 770; *Gelfand* v. *State Bank*, 172 N. Y. Supp. 99; *Atlantic Communication Co.* v. *Zimmerman*, 182 App. Div. 862; *Chemical Bank* v. *Eq. Trust Co.*, 201 App. Div. 845; *Strohmeyer & Arpe* v. *Guaranty Trust Co.*, 172 App. Div. 16; *Katcher* v. *American Express Co.*, 94 N. J. L. 165; *Alemian* v. *American Express Co.*, 237 Mass. 580.) Since time was not originally of the essence of the contract and was never made of the essence and there was no repudiation by defendants, but merely delay, there can be no rescission by plaintiff. (*Legniti* v. *M. & M. Nat. Bank*, 230 N. Y. 415; *Graves* v. *White*, 87 N. Y. 463; *Dubois* v. *Delaware & Hudson Canal Co.*, 4 Wend. 290; *Hubbell* v. *Pacific Mutual Insurance Co.*, 100 N. Y. 41; *Ehrensperger* v. *Anderson*, 3 Exch. 148; *Taylor* v. *Goelet*, 208 N. Y. 253; *Pierson & Co.* v. *Am. S. E. Co.*, 194 App. Div. 555; *S. & B. Mfg. Co.* v. *American Separator*, 158 App. Div. 63; *American Metal Co., Ltd.*, v. *Neuman*, 184 App. Div. 229; *Erdreich* v. *Zimmermann*, 190 App. Div. 443.)

*Winthrop W. Aldrich* for Equitable Trust Company of New York, *amicus curiæ*. The contract involved in the present case was an executory contract subject to the ordinary rules applying to such contracts. (*Atlantic Communication Co.* v. *Zimmerman & Forshay*, 182 App. Div. 862; *Zweifler* v. *Public Bank of New York City*, 196 App. Div. 969; *Pfotenhauer* v. *Equitable Trust Company*, 115 Misc. Rep. 396; 201 App. Div. 846; *Goepel*

v. *Zimmerman,* 199 App. Div. 915; *Chemical Nat. Bank v. Equitable Trust Co.,* 201 App. Div. 485; *Safian v. Irving National Bank,* 202 App. Div. 459; *Bank of British North America* v. *Cooper,* 137 U. S. 473; *Bank of China, Japan & The Straits, Ltd.,* v. *American Trading Co.,* L. R. 1894 A. C. 266.)   On general principles of contract law, whether the transaction is an executory contract or an executory sale, the plaintiff, respondent, would be entitled to rescind.   (*Pope* v. *Alice,* 115 U. S. 363; *Freer* v. *Denton,* 61 N. Y. 492; *Cockcroft* v. *Muller,* 71 N. Y. 367; *Bigler* v. *Morgan,* 77 N. Y. 312; *Brokaw* v. *Duffy,* 165 N. Y. 391; *Glenn* v. *Rossler,* 88 Hun, 74; *Nash* v. *Towne,* 5 Wall. 689; Williston on Contracts, §§ 1455, 1457; *Flandrow* v. *Hammond,* 148 N. Y. 129; *Chapman* v. *City of Brooklyn,* 40 N. Y. 372.)

*Frederick T. Kelsey* and *Charles C. Pearce, amici curiæ.* A wireless transfer transaction creates an executory contract, as distinguished from a sale. (*Paul* v. *Insurance Co.,* 112 N. Y. 472; *Rickerson* v. *Ins. Co.,* 149 N. Y. 307; *Gillett* v. *Bank,* 160 N. Y. 549; Page on Contracts, §§ 2023, 2053, 2054; *Wright* v. *Reusens,* 133 N. Y. 298; *Mansfield* v. *N. Y. C. & H. R. R. R. Co.,* 102 N. Y. 205; *Atlantic Communication Co.* v. *Zimmermann,* 182 App. Div. 862; *Chemical Nat. Bank* v. *Equitable Trust Co.,* 201 App. Div. 845; *Goepel* v. *Zimmermann,* 199 App. Div. 915; *Gravenhorst* v. *Zimmermann,* 202 App. Div. 819.) Rescission is the proper remedy. (*Putnam* v. *Wescott,* 19 Johns. 73; *Chapman* v. *Brooklyn,* 40 N. Y. 372; *Cockcroft* v. *Muller,* 71 N. Y. 367; *Bigler* v. *Morgan,* 77 N. Y. 312; *Graves* v. *White,* 87 N. Y. 463; *Welch* v. *Gosler,* 89 N. Y. 540; *Hill* v. *Blake,* 97 N. Y. 216; *Northrup* v. *Moore,* 118 N. Y. 419; *Bean* v. *Carleton,* 36 N. Y. S. R. 123; 126 N. Y. 642; *Daragh* v. *Ross,* 28 N. Y. S. R. 632; 130 N. Y. 641.)

*George E. Morgan* and *Paul G. Gravenhorst* for respondent. In order to entitle a defendant to a trial he must

show that he has a *bona fide* defense to the action which he may be able to establish. And that it is a defense that is plausible and fairly arguable, and of a substantial character. (*Dwan* v. *Massarene*, 199 App. Div. 872.) The answer interposed by the defendants presents no fact sufficient to raise a triable issue, nor does it set forth any principle of law which constitutes a defense to the action. (*Atlantic Com. Co.* v. *Zimmerman & Forshay*, 182 App. Div. 862; *Pfotenhauer* v. *Eq. Trust Co.*, 115 Misc. Rep. 396; 210 App. Div. 846; *Cutler* v. *Am. Ex. Nat. Bank*, 113 N. Y. 593; *People ex rel. Zotti* v. *Flynn*, 135 App. Div. 276; *Legniti* v. *M. & M. Nat. Bank*, 230 N. Y. 415.)

*Harold W. Bissell, amicus curiæ.* Cable, wireless and draft transactions in foreign exchange have one fundamental feature in common — each form of transaction is a sale of an order on a foreign bank plus an engagement that the foreign bank will honor the order on due presentation. (*Suse* v. *Pompe*, 8 C. B. [N. S.] 538; *American Express Co.* v. *Cosmopolitan Trust Co.*, 239 Mass. 249; *Bank of the United States* v. *United States*, 2 How. [U. S.] 711; *Pavenstedt* v. *New York Life Ins. Co.*, 203 N. Y. 91; *Leavitt* v. *De Launy*, 4 N. Y. 363.)

Hiscock, Ch. J. This action involves a transaction in foreign exchange and leads to the practical question who shall bear the loss springing out of that transaction.

On March 31, 1917, the plaintiff's assignor paid to the defendants the sum of $8,500 in consideration of which they agreed to make a wireless transfer of 47,222 marks to the account of a designated payee at a designated bank in Berlin. Owing to the war into which we were then about to enter our government at this date had taken control of wireless stations, and mail communications between this country and Germany were soon suspended and, as the result of these conditions, the marks were

not placed to the credit of the payee until January, 1920. The plaintiff, claiming that the original contract was an executory one and that it had been duly rescinded because of the failure of defendants to comply therewith, brought this action to recover the money paid to them as above stated and subsequently made an application for summary judgment which was granted.

The defendants by their answer and by supporting affidavits presented four alleged defenses in opposition to such application which require consideration. They claimed, *first*, that the transaction was an executed, present sale of exchange and, therefore, not subject to rescission; *second*, that whatever otherwise might have been the interpretation of their contract there were certain customs governing the subject of foreign exchange which relieved them from responsibility; *third*, that a modified contract had been substituted; *fourth*, that the plaintiff's assignor, whatever right it may have had to do so, never in fact effected a rescission of its contract and, therefore, that this action cannot be maintained. If they made it appear that under any one of these defenses a genuine and substantial issue was created they were entitled to a trial in the regular order and a summary judgment was improper. (*General Investment Co.* v. *Interborough Rapid Trans. Co.*, 235 N. Y. 133.)

The first of the questions presented, the one whether the ordinary transaction for the acquirement of foreign exchange results in an executed sale of something or an executory contract to do something, has become one of great importance in banking and commercial circles and is the subject of earnest discussion. This court has not as yet had occasion to pass upon the question in its familiar form. In *Legniti* v. *Mechanics & Metals National Bank* (230 N. Y. 415) we expressly reserved decision of the question. In *Equitable Trust Co.* v. *Keene* (232 N. Y. 290) the question arose on demurrer to a complaint and the allegations of the complaint without entirely con-

trolling our views as to the nature of the transaction did somewhat limit them. We come now to the consideration of one of these transactions presented in what we judge to be a fairly typical manner.

The negotiations between plaintiff's assignor and defendants began with the request by the former for a quotation at which the latter would " sell about 45,000 marks wireless," and which was duly answered with quotations. This was followed by some telephonic or telegraphic messages which are not considered of importance and then by the final communications between the parties which, interpreted in the light of their conduct thereunder, must fix the nature of the transaction. The assignor wrote to the defendants a letter containing the following paragraph: " Confirming telegram exchanged and phone conversation we accept your rate of 72 for $8,500 wireless transfer to Berlin and shall thank you to transfer the equivalent, viz: 47,222.22 marks to the Deutsche Asiatic Bank, Berlin, in favor of Mr. Max Mittag, Shanghai. As agreed we shall reimburse you by telegraph first thing tomorrow morning for the amount of $8500 and on receipt of your bill for wireless charges we shall be pleased to send you check for the same." In response to this defendants delivered to the assignor a memorandum which read as follows:

" To ZIMMERMANN & FORSHAY,
       " 9 and 11 Wall Street.
" Terms:   Cash or Certified Check

| | |
|---|---:|
| M 47,222–Wireless transfer at 18............ | $8500.00 |
| Wireless Expenses........................ | 10.60 |
| | $8510.60 |
| Check............................... | 8500.00 |
| Due us.............................. | $10.60 |

" Neither Zimmermann & Forshay nor their correspondents are responsible for delayed payment or non-

payment of the above amount caused by any delay or error on the part of the Cable Co. in the transmission or the delivery of the message ordering the payment.

" In case of non-delivery of cable message payment will be effected by our correspondent upon receipt of our mail confirmation.

" Kindly remit.
" Payable to Deutsche Asiatic Bank
" Berlin
" For account of Max Mittag Shanghai
" Through Deutsche Bank, Berlin."

To this memorandum the assignor answered: " We are in receipt of your favor of 31st ult. As requested enclose check for $10.60 in settlement of cost of wireless regarding transfer of 47,222 marks to the Deutsch Asiatic Bank, Berlin, for the account of Mr. Max Mittag, Shanghai." Immediately defendants delivered to the wireless telegraph company a message for transmission to the Deutsche Bank in Berlin where they had an account instructing said bank to pay to the Deutsche Asiatic Bank of Berlin for the account of the said Max Mittag the sum of marks in question.

It would be impossible within reasonable limits and we think rather profitless to attempt to review all of the authorities which have debated the issue whether such a transaction as this was a sale or an executory contract, or to attempt to analyze at length all of the arguments and different theories which have been earnestly urged upon us in favor of the former answer to that question. The transaction as evidenced by the agreement between the parties and as interpreted by the acts of the defendants in trying to effectuate their agreement, seems to us to contain certain fundamental features which cannot be eliminated and which give to the contract the character of future performance, that is, make it executory rather than an executed sale and transfer. We are aided in

determining what the undertaking is by clearly seeing what it is not.

Concededly the defendants did not deliver to plaintiff's assignor any marks and did not set apart actual money which it then undertook for the account of the purchaser to transport and deposit to the credit of the designated payee in a given bank. Certainly no actual money passed from the banker to or for the account of the customer. But it has been urged that the customer purchased a contract to create a credit for its payee and that thus there was an executed sale. This seems to us to involve a mere redundancy of words. If a person made a contract with a carpenter whereby in consideration of the payment of a certain sum of money the latter agreed to build a house nobody we believe would think of calling this the purchase of a contract but would regard it as a simple contract whereby something was to be done in the future. The same reasoning seems to us to apply to the agreement in one of these transactions whereby the banker agrees to erect a credit for a given amount of foreign money.

In the *Keene Case* (*supra*) the theory was especially pressed upon us that one of these transactions was a sale of credit and, therefore, executed, but we answered that theory in language entirely applicable here. We said: "In such an agreement (one relating to foreign exchange) there is no guaranty or necessary implication that the contractor has any credit which he is selling or agreeing to sell or that he will place the credit through a third party as correspondent. He can fulfil the terms of such an agreement through his branch office and he can after making the agreement create for himself the credit which will enable him to place to the credit of the other party to the agreement the funds in question. We are unable to see how such an agreement is other than a contract for future action, no matter how speedily accomplished, or how it can be a sale of an existing right."

1923.] Opinion, per HISCOCK, Ch. J. [236 N. Y. 22]

On the present appeal a strenuous effort is made to liken a transaction in foreign exchange to the purchase of a draft or bill of exchange and then to force the conclusion that because the latter transaction is regarded as a purchase or sale the former also must be stamped with that character. Assuming that there may be some similar features in the case of a purchased draft and of an order for the transmission of foreign exchange, we think there is no similarity between them in respect of the question which we are discussing. One who secures a draft obtains a written order by the drawer upon the drawee which by commercial usage and even by statutory enactment in some jurisdictions has come to be recognized as the symbol and equivalent of money and which enables the one who has obtained it without further action by the drawer to secure from the drawee the moneys which it represents. In consideration of the money paid by him he has actually obtained an instrument for the payment of money and which is regarded as its equivalent, and it is perfectly natural to speak of such a transaction as resulting in the executed purchase of a draft. A person who makes a contract for a credit in foreign exchange accomplishes no such result. He has secured nothing which will pass for money or which will enable him except through the action of the banker to obtain the exchange which he desires. It gives him no control whatever over the course of events which will lead to the establishment of the credit. The banker retains entire control of this and by his future actions causes to be set up the credit which will eventually enable the customer to obtain the exchange in money which he desires.

So, considering what the banker in a transaction like the present one does not do or attempt to do as well as that which he does do, it seems to us that in the final and accurate analysis his contract is that in consideration of the money paid to him he will create a credit for a given person of a given amount of the desired foreign money at

a given place through orders dispatched by wireless and confirmed by mail to somebody who will obey his directions in setting up the credit and that thus his contract when he makes it is not an executed act but an executory agreement.

But it is argued that whatever otherwise might be the meaning and effect of the contract made by defendants this meaning and effect were so modified by clauses in their memorandum and by custom pertaining to transactions in foreign exchange, of which they might give evidence upon the trial, that the liability which has been imposed by the present judgment was unwarranted. The clauses in the memorandum to which reference is made are the ones providing that the bankers shall not be liable " for delayed payment or non-payment * * * caused by any delay or error on the part of the cable company in the transmission or the delivery of the message ordering the payment." Interpreted in the light of other provisions in the memorandum and of the entire transaction we think that these exemptions were applicable only to an ordinary case of delay or error and were not sufficient to cover an instance of total suspension of telegraphic and mail communications such as was encountered in the present case.

The customs claimed by defendants to prevail in the city of New York in respect of transactions in foreign exchange and to have been known by plaintiff's assignor at the time the present transaction was consummated, were stated upon the motion to be that " the seller of the wireless or cable transfer is not responsible for the actual delivery to this correspondent of the message ordering the payment and such seller does not obligate itself actually to make such payment through its correspondent. Under said customs the wireless telegraph company and the United States Post Office are the agents of the purchaser and not of the seller for the purposes of transmission, and delivery of the message to a wireless

telegraph company and the deposit of the letters of confirmation constitute delivery by the seller to the purchaser. That in case of delay or non-delivery of the message the seller agrees to pay to the purchaser upon his demand interest at the same rate as is allowed to it by its foreign correspondent upon the amount of foreign money sold." Paraphrasing somewhat this statement of custom it is that the wireless system and the post office service are the agents of the customer and not of the banker; that the latter discharges his full duty when he delivers his wireless message and confirmatory letter; that he has no responsibility for their transmission and does not place himself under any obligation to carry out his contract except that in a case of delay or non-delivery he will pay to the customer the same rate of interest as is allowed by his correspondent.

When we compare this alleged custom as thus stated we see that it is in contradiction of the contract between the parties as we have interpreted it and that it would permit the banker to accept and retain the money paid to him by his customer without any real responsibility and even without any consideration. As we have pointed out, the contract made between these parties was one upon the part of the banker in consideration of a large amount of money received by him to establish a given credit by wireless message confirmed by letter. This agreement by necessary implication made the instrumentalities of wireless and mail his agents and his responsibility extended far beyond a mere delivery of a wireless message or letter. Independent of any consideration of business morality which might be involved in allowing a banker to take his customer's money without any responsibility for any adequate return, the custom in question if established would utterly overturn the agreement between the parties. Evidence of custom is permitted for the purpose of qualifying the meaning of a contract where otherwise

3

ambiguous and of providing for incidents not in contradiction of the fundamental provisions of the contract and of supplying omissions under certain circumstances which have occurred in the agreement of the parties. Evidence of it is not permitted for the purpose of contradicting the agreements which the parties have made or for the purpose of accomplishing an unfair or immoral construction of their contract. (*Fuller* v. *Robinson*, 86 N. Y. 306; *Com. Exch. Bank* v. *Nassau Bank*, 91 N. Y. 74; *Moore* v. *U. S.*, 196 U. S. 157, 166; *Menage* v. *Rosenthal*, 175 Mass. 358; *Guild* v. *Sampson*, 232 Mass. 509.)

We find nothing presented upon the motion for judgment which was indicative of any evidence which would have permitted a jury to find that the contract made between the parties was modified by one to the effect that defendants were to hold the marks for the establishment of a credit for which plaintiff's assignor paid, until the credit could be established with an allowance of interest at the rate of two per cent.

Having thus concluded that the contract made by plaintiff's assignor with defendants was an executory one of which performance was not effected until January, 1920, nearly three years after the date of the contract, we come to the final question whether the assignor was entitled to and did rescind said contract and become entitled to recover back its money. And it is to be kept in mind that the only rescission claimed by plaintiff to have been effected was one in April, 1917, and the claim is based upon correspondence at that time occurring between his assignor and defendants.

So far as concerns the nature of the contract and the general principles governing the subject of rescission we see no bar in plaintiff's way. We especially do not find that he encounters any difficulty from those two equitable and just rules which require that a party attempting to rescind must restore to the other anything which he has received, and second, must not inflict injury upon the party

against whom rescission is sought, because under the contract the latter has changed his position and cannot return to the point from which he started. Plaintiff's assignor obtained nothing from the defendants except a memorandum of the contract and, therefore, there was nothing for him to restore so far as we can discover. The defendants by reason of this contract were not led into assuming a changed position which would be a source of damage if the contract were rescinded. It is stated in their behalf that they had a credit with the Deutsche Bank and that their attempt was to have this bank create a credit with the one specified by their customer. Apparently they were able to carry through no communications to this correspondent bank between the time when they made their contract with plaintiff's assignor and a date long subsequent to the time when it is claimed that the rescission was effected. Under these circumstances we find nothing to indicate that as the result of their present contract their situation was changed or a larger balance maintained with greater resulting damage as the result of the depreciation in marks, than would have been maintained except for this contract.

We shall also assume, without deciding, that plaintiff is correct in his claim that time was of the essence of the original agreement which defendants made and that his assignor was entitled on their breach to make a prompt rescission. The credit was to be effected by wireless. This imported haste and this feature was not eliminated simply because some contingency such as failure or mutiliation of the wireless message might require delay for the arrival of the written confirmation which was to follow. The intent of the parties was speed; delay meant probable loss and it is well settled that where the contract of the parties fairly leads to the inference that time is an essential consideration and feature, enforcement of this feature will be given although the contract does not explicitly specify it. (*Legniti* v. *Mechanics, etc.,*

*Bank, supra; Equitable Trust Co.* v. *Keene, supra; Helgar Corporation* v. *Warner's Features,* 222 N. Y. 449.) But assuming all this in favor of plaintiff the question still persists whether the rights under the original contract were preserved and whether a rescission was so conclusively effected that the trial judge had the right to say that there was no substantial issue and that, therefore, summary judgment should be granted. We do not think this was the situation.

We shall pass by without decision and leave for future consideration the first alternative of this question, whether the assignor allowed his contract to drift into one only requiring fulfillment by defendants within a reasonable time and imposing upon him the duty of bringing to an end this reasonable time by appropriate notice before he could rescind. (*Taylor* v. *Goelet,* 208 N. Y. 253; *St. Regis Paper Co.* v. *Santa Clara Lumber Co.,* 186 N. Y. 89; *Mawhinney* v. *Millbrook Woolen Mills,* 234 N. Y. 244; *Hennessey* v. *Bacon,* 137 U. S. 78, 84.) We shall consider simply the second alternative of the question whether the fact of a rescission by the assignor of his contract with defendants in April, 1917, is so indubitably and conclusively established as to leave no substantial issue for trial. This makes necessary a consideration somewhat at length of the correspondence between the parties for there were no parol negotiations. This correspondence commenced by a letter from the assignor under date of April 10, 1917, stating that defendants' wireless message to create the credit had probably been held up and requesting defendants to return its money. This letter was followed by several communications back and forth between the parties in which was discussed the question of the delivery of the wireless message and in which defendants denied the responsibility alleged against them by the assignor and declined to return the money, and they finally expressed the opinion that under the Trading with the Enemy Act " We will have to deliver

the moneys after the cessation of hostilities. As we have written you before we shall be glad to allow you 2% per annum on the deposit." The assignor answering this letter stated that the rate of interest offered "looks very low" and that a rate of three per cent was allowed various other depositors by the German banks and that it awaited to hear from defendants in the matter, and to which the defendants replied that they were not in a position to interrogate their correspondents in respect to the rate of interest which they were allowing and, therefore, could not give any definite answer on the subject of interest, but would do so "upon return of normal conditions." Under this reply the assignor allowed the matter to rest in absolute quiescence for about two years, when there was a second installment of correspondence. This opened and continued with inquiries by the assignor concerning the event of defendants' attempt to transmit the exchange and included excuses by the latter for their delay in ascertaining whether the transfer had been effected and promises of continued effort and further information. To these communications the assignor rejoined with letters which contained such expressions as these: "This matter should be settled by this time and if the transfer has not been effected we expect you to refund to us the amount of $8,500 plus interest * * * promptly." "We, therefore, cannot acknowledge the reasons given by you for not winding up one way or the other the payment under question and expect you to return to us promptly the $8,500 paid you in March, 1917, for a wireless transfer to Berlin," and "We cannot hold this matter open any longer and herewith request you either to confirm to us that this transfer has been made or to return to us the amount of $8,500 paid to you at the time in settlement of this exchange transaction," and, "We * * * cannot see why you should insist on dragging this matter along and we request prompt settlement one way or the other." But these letters were

followed by others in which the defendants were requested to write their correspondents asking them either to place at the disposal of the designated payee $8,500 in gold or to refund to defendants this amount for the account of their customer and that it was " waiting your further news in the matter," also asking for information about the action of the alien property custodian.  The last word was a letter by defendants calling attention to prior letters and asking the assignor to " advise what disposition it desired made of the matter."  Then again, so far as the record discloses, complete inactivity and silence settled down over the entire transaction for a period of a year and a half when, without further notice or action, this suit was commenced.

Rescission may be a matter of acts as well as of words. Formal notice of cancellation of a contract may be utterly counteracted and overborne by subsequent recognition of it as an existing obligation.  A party cannot by words cancel his contract and then continue to assert rights and benefits and negotiate under it.  This plaintiff is confronted by this obvious and just rule.  We shall assume that the letter of April 10, standing unimpaired would have effected a rescission.  But we are of opinion it cannot be said conclusively that it did thus stand unimpaired.  It was followed by much correspondence and delay in which each side urged its views, in which the defendants made explanations, assertions and promises and in addition to everything else, the assignor reacted with a delay of over three years from the date of the alleged rescission.

Under the circumstances one person may argue that as matter of law the assignor abandoned and lost the benefit of his rescission; another might think that such abandonment was a question of fact for the jury.  But upon one proposition we are all agreed, and that is the primary one presented upon this appeal — the right to a summary judgment.  It never could have been, or in justice ought

to have been, the intention of those who framed our
Practice Act and rules thereunder that the decision of
such a serious question as this should be flung off on a
motion for summary judgment. Whatever the final
judgment may be the defendants were entitled to have
the issue deliberately tried and their right to be heard in
the usual manner of a trial protected.

Therefore, the judgments appealed from should be
reversed, with costs in all courts, and the application for
summary judgment denied, with ten dollars costs.

HOGAN, POUND and McLAUGHLIN, JJ., concur;
ANDREWS, J., concurs in result; CRANE, J., dissents on
ground that rescission was established as matter of law;
CARDOZO, J., not voting.

Judgments reversed, etc.