### SAMUELS v. E. F. DREW & CO., Inc.

### In re BANCO NACIONAL ULTRAMARINO.

(Circuit Court of Appeals, Second Circuit. January 4, 1924.)

No. 1851.

1. **Banks and banking** ⬤⟞192—**No appropriation for exchange sale contract by undelivered check.**

    The drawing of two undelivered checks by a party to two executory contracts for the sale of pounds sterling *held* not to constitute an appropriation of specific money for these contracts, as under Negotiable Instrument Law N. Y. § 35, one's own undelivered check is not regarded as property, and is of no force and effect whatsoever.

2. **Assignments** ⬤⟞49—**Check is not assignment of chose in action.**

    Under the Negotiable Instrument Law N. Y. § 325, a check is not an assignment of a chose in action by a drawer in favor of payee.

3. **Receivers** ⬤⟞90—**Executory contract for sale of pounds sterling terminated by appointment of receivers for buyer.**

    Transactions evidenced by two memoranda, dated August 20, 1920, and confirmed August 21, 1920, reciting that claimant had "sold" to defendant mail transfers on London at defendant's option, in October, for £75,000 sterling, *held* executory contracts, terminated by the appointment of receivers for defendant on October 30, 1920.

4. **Receivers** ⬤⟞151—**Measure of damages for breach of executory contract for purchase of pounds sterling.**

    The measure of damages for breach of an executory contract for the purchase of pounds sterling, resulting from appointment of receivers for buyer, is the difference between the contract price and the price at which

---

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the pounds sterling could have been sold on the day receivers were appointed.

5. **Banks and banking ☞140(1)—Until certified. bank owes holder no obligation to pay check.**

A check is a revocable order, and under Negotiable Instrument Law N. Y. § 189, it does not constitute an assignment pro tanto by drawer of his account with the bank; but, until it is certified by the bank, there is no obligation on the bank in favor of the holder.

6. **Trusts ☞1—Debtor cannot be trustee of own obligation.**

A debtor cannot be a trustee of its obligation to creditor, nor can debtor hold its obligation to creditor as security, for security presupposes the existence of property.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Sumner L. Samuels against E. F. Drew & Co., Inc. In the matter of the claim of the Banco Nacional Ultramarino against the receivers of defendant. From an order allowing the claim in part, at $19,937.50, claimant appeals. Affirmed.

Brown, Cooksey & Hines, of New York City (Charles Paul Brown and William Doran Cushman, both of New York City, of counsel), for appellant.

Lowenthal, Szold & Perkins, of New York City (Maxwell Brandwene, of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The claim filed by the Banco Nacional Ultramarino arises from the breach of contracts of the sale of £75,000 at London by the appellant to the defendant. The transactions are evidenced by two memoranda of the appellant, dated August 20, 1920, and a written confirmation of the defendant, dated August 21, 1920, both of which read as follows:

Memorandum

Agency                                                   August 20, 1920.

Banco Nacional Ultramarino, 93 Liberty Street, New York.

To Messrs. E. F. Drew & Co., 50 Broad St., N. Y. C. Foreign Exchange Department—bought from—Dear Sirs: We confirm having sold to you through Messrs. J. K. Gable Pauw & Co. mail transfer on London payable here and abroad your on option October for £25.000 @ 3.68¼, making $92,062 50, for which amount kindly hand us your cheque.

we will hand your our cheque.

Please instruct your correspondents to pay this amount to ...... for the credit of our account.

Yours very truly,                    pp. Banco Nacional Ultramarino,

[writing]
Refer to our confirmation Aug. 21/20.

[stamp]
We confirm this purchase.

E. F. Drew & Co., Inc.,<br>[Signed] A. J. Knox, Assistant Treas.

Note.—Kindly sign and return duplicate to us.

Memorandum

Agency                                                          August 20, 1920.

Banco Nacional Ultramarino, 93 Liberty Street, New York.

To Messrs. E. F. Drew & Co., 50 Broad St., N. Y. C., Foreign Exchange

~~bought from~~

Department—Dear Sirs: We confirm having sold to you through M. J. K. Pauw

~~Cable~~

& Co. Mail transfer on London payable here and abroad your on option

August

September for £50,000 @ 3.71¾ making $185,875.00 for which amount

October

kindly hand us your cheque.

------

~~we will hand you our cheque.~~

Please instruct your correspondents to pay this amount to ...... for the credit of our account.

Yours very truly,                         pp. Banco Nacional Ultramarino.

[writing]

Refer to our confirmation Aug. 21/20.

[stamp]

We confirm this purchase.

E. F. Drew & Co., Inc.,

[Signed] A. J. Knox, Assistant Treas.

Note.—Kindly sign and return duplicate to us.

On October 20, 1920, the defendant requested appellant for an extension of the delivery date of £65,000 of the £75,000 agreed to be purchased. This request was refused. On October 29th, in response to a request of the appellant for information as to the disposition of the £75,000 agreed to be purchased by the defendant, the defendant requested the appellant to find a purchaser. The appellant found a purchaser for the £75,000 at 3.45⅛, but, as stipulated, owing to a failure of the parties to come to an understanding, the pounds were not sold. But on October 29th the appellant prepared two checks signed by it and drawn on its London branch, payable to the order of the defendant, one for £50,000, and the other for £25,000. The evidence is conflicting as to whether the checks were presented to the defendant on October 29th and the acceptance and payment thereof refused. The master has found such presentation and refusal. On October 30th receivers in equity were appointed for the defendant corporation. It is agreed that the appellant was at all times able and willing to carry out its obligations under the terms of this agreement. The fair market value of pounds sterling checks on London on October 30th was 3.44, at which price these checks would have brought $252,000, which was $19,937.50 less than the agreed purchase price therefor. The appellant did sell on November 3, 1920, at which time the price was 3.43⁷/₁₀, leaving a difference between the contract price and the selling price of $20,359.38.

The court below, confirming the report of the master, held that the contract in question was executory, and was breached by the appointment of receivers on October 30, 1920, and that the measure of damages sustained by the appellant was the difference between the fair market value on that day of pounds sterling and the contract price as fixed by the parties. The appellant's contention on this appeal is that the claim of the appellant against the receivers be allowed in the full amount of $277,937.50, with interest thereon from November 1, 1920, to November 3, 1920 (the date on which it sold the pounds sterling

in question), in the sum of $182.75, and that it apply the amount of the proceeds received by it from the sale of the £75,000, to wit, $257,578.12, on the amount it claims· against the receivers, and that the receivers, be directed to pay to the appellant dividends upon the full amount of its claim of $277,937.50, plus interest, but that such dividend payments by the receivers should not exceed the amount of the difference, to wit, $20,542.13.

The parties by their contracts, agreed to make mail transfers in the amount of £75,000 at some date in October, 1920, at the option of the defendant. The contracts provide the amounts which the defendant is to pay to the appellant in effectuating such mail transfers. There is nothing in the contracts as to the sale or purchase of checks. All that is referred to is the mail transfers. It is not provided, nor, indeed, was it essential, that the appellant specifically set aside £75,000 subject to call by the defendant at its option in October, and apparently no pounds were appropriated by the defendant for the purposes of the contracts. The obligation contemplated was that, concurrent with the effectuation of the mail transfer by the appellant, the defendant should pay the sum of $277,937.50. The mail transfer precludes the idea that an actual transmission of money was contemplated. '

[1] Two checks were drawn by the appellant on its branch in London, payable to the defendant, on October 29, 1920, two months after the contract was entered into. This was the only evidence in the record that the appellant did anything in connection with the contracts for the purpose of its performance. This did not constitute a setting aside of the funds for·the purposes of the contracts. The checks were orders by the claimant on its own branch, and did not constitute an appropriation of specific money. One's own undelivered check is not regarded as property, and of no force and effect whatsoever. Negotiable Instrument Law N. Y. (Consol. Laws, c. 38) § 35.

[2] A check is not an assignment of a chose in action by the drawer of the check in favor of the payee. Negotiable Instrument Law N. Y. § 325. In Equitable Trust Co. of New York v. Keene, 232 N. Y. 290, 133 N. E. 894, 19 A. L. R. 1137, the plaintiff agreed to deliver to the defendant, and the defendant agreed to take from the plaintiff, a cable transfer of exchange on London in an amount for immediate delivery. The defendant refused to go on, and set up as a defense the statute of frauds. The court held that a cable transfer of property is a term used to describe the transfer of credits between different points by cable; the person contracting to deliver such exchange agreeing that he will make it available and the other contracting to take such exchange of credit at the point and time specified. The court said:

"The fact that the transaction is to be effectuated by cable is of course immaterial; the principles defining the nature of the transaction are not any different than they would be if the transaction was to be accomplished by letter. * * * The cable gives needed speed to the operation, but does not change its nature."

[3] These are executory contracts for the sale of pounds sterling, and were terminated by the appointment of receivers for the defendant. Samuels v. Drew, In re El Dorado Oil Works (C. C. A.) 292 Fed. 734. The fact that the word "sold" is used in the contracts does

not change this conclusion. It is apparent that it was not the intention, or even within the contemplation, of the parties that the appellant would set aside a specified fund of £75,000, which it would hold for the benefit of the defendant until some time in October, 1920, at which time the defendant might exercise its option and request the appellant to carry out its obligations under the contract. It was intended by the parties that the appellant would effectuate the mail transfer in London in accordance with the customary practice. This meant the concurrent transfer in pounds sterling as the agreed contract price was paid. Gravenhorst v. Zimmerman, 236 N. Y. 22, 139 N. E. 766, 27 A. L. R. 1465. A banker's transaction, whereby money is purchased, is often spoken of as "purchased exchange"; but, where the banker does not deliver a bill or draft to the customer, it is regarded as a figure of speech, and what the customer purchases is the banker's undertaking or obligation to effect the payment at a different point.

The transaction often involves, not only the payment of money at a distant point, but payment of a different kind of money from that in use at the point where the money is received by the bank from the depositor. To speak of it as a purchase of that particular kind of money is a convenient way of describing the transaction; but in law what occurs is that the banker is obligated to secure credit at the distant point payable to the particular money contracted for, as the case may be, when and where wanted. Even when the obligation is performed and the credit established, the customer is only the owner of an obligation or chose in action and not of any actual foreign money. The banker, having arranged such credit, will not be expected to deal with the money in any different manner than in the case of other moneys deposited with the banker by other customers. Such moneys may be commingled with the general funds of the banker and dealt with by him as his own funds, to be paid out in the course of his banking business. Customers, in dealing with the banker, in the absence of an express stipulation, deal with him in reliance on his personal credit, and not on the presence in the banker's hands of any specified fund to which he may assert claim. It would not be expected that a banker in transacting exchange business, would maintain segregated funds for each customer until the transaction is completed. See Stone in 21 Columbia Law Review, p. 507; Gravenhorst v. Zimmerman, supra.

[4] Nor is this result affected by the fact that the appellant offered two checks, one for £50,000 and the other for £25,000, on October 30th. The defendant had the right, under the terms of these contracts, to wait until the last day of October, 1920, before exercising its option to call on the appellant to effect the mail transfer and, in turn, it was not obliged to make the transfer until this option was exercised. The contract was breached by the appointment of the receivers. Samuels v. Drew (C. C. A.) 292 Fed. 734; Pennsylvania Steel Co. v. N. Y. City Ry., 198 Fed. 721, 117 C. C. A. 503. At the time of that breach by the defendant, the damages were fixed. The measure of damages provable by the appellant against the receivership fund was the difference between the contract price and the price at

which the pounds sterling could have been sold on the day the receivers were appointed. As found below, this sum was $19,937.50. But it is argued that the appellant's own check was a security for the obligation of the defendant to the appellant. The checks tendered were drawn upon a branch bank of the appellant. They were not drawn pursuant to any requirement of the contract. The delivery of the checks drawn upon London by the appellant did not amount to the assignment of any credit which it might have had with a bank upon which the credit was drawn. No res was created. A creditor can claim to hold as security for his debt property only to which the debtor has a title and in which he has an interest. There was no property in possession of the appellant's bank to which the defendant either had title or interest.

[5, 6] The check was a revocable order. Florence Mining Co. v. Brown, 124 U. S. 391, 8 Sup. Ct. 531, 31 L. Ed. 424. And under Negotiable Instrument Law N. Y. § 189, it does not constitute an assignment pro tanto by the drawer of the check of his account with the bank. Until it is certified by the bank, there is no obligation on the bank in favor of the holder of the check. The obligation, therefore, was that of the drawer of the check. The defendant could not be a trustee of its obligation to the appellant, nor could its obligation to the creditor be held as security, for security presupposes the existence of property.

We are referred to Merrill v. Nat. Bank of Jacksonville, 133 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, as in support of the appellant's claim. In that case, on an obligation of one bank to another, part of which was secured and part of which was unsecured, a receiver having been appointed of one, the other proved its unsecured claim in the full amount. The court would not permit it to prove for the full amount of the secured claim until it sold the collateral. After selling the collateral and applying it as against the secured loan, it was allowed to prove only to the extent of the balance remaining unpaid on the sale of the loan. The Supreme Court held that as a secured creditor it could prove and receive dividends upon the face of its claim as it stood at the time of the declaration of insolvency, without crediting either its collateral or collections made thereunder after such deduction, subject, however to the proviso that the dividends must cease when from them and from collaterals received, the claim had been paid in full. We regard the case as inapplicable here, for here there was no security.

The appellant cannot prove an amount in excess of $19,937.50, for that is the measure of its damages under the rule of law applicable for breach of an executory contract of sale.

Order affirmed.