This litigation grew out of the plaintiff's attempt during the war to effect payment of money that he owed to one Adragnia of Alcamo in Italy. To this end, *Page 189 
on June 13, 1941, he paid to the defendant's agent at Passaic, New Jersey, $2,431.85 for a cable transfer of 60,000 misto lire to Adragnia at Alcamo. Italian foreign exchange regulations divided lire into several classes according to the origin of the fund and the purpose for which it could be used: Misto lire, emigrant lire, tourist lire and free lire. The same day that the plaintiff arranged for the transfer, the defendant cabled its correspondent in Rome instructions to make the payment to Adragnia. The payment, however, was never actually made and plaintiff sues for the return of his money. The Law Division gave him judgment for $600 which was the value of 60,000 lire in the winter of 1945, at which time the court found the defendant should have ascertained that the moneys had not been paid to Adragnia and should have made refund to plaintiff.
The defendant, in order to carry on its business of transmitting funds to central and southern Italy, maintained a balance of each of the several classes of lire with its Rome correspondent, the American Express Company, Societa Anonima Italiana, generally spoken of in the proofs as the S.A.I. Whenever the balances ran low, the defendant would buy lire on the foreign exchange market and have them credited to its account with the S.A.I. According to the defendant's books, it had a balance with the S.A.I. of 251,731 misto lire on June 13, the day of the transaction with plaintiff. The next day, June 14, Italian credits in the United States were frozen by Presidential order, and it became no longer possible for the defendant to transfer funds from this country to Italy except by special permit of the Treasury Department. Two days later, the Italian government retaliated by blocking American balances in Italy. The S.A.I. could not thereafter make payments for defendant's account except after obtaining from the Italian exchange bureau (the Instituto) a license for each separate payment.
On August 5, defendant received from the S.A.I. a letter dated July 13th setting forth in detail the account between the two companies. It showed that the S.A.I. was holding in suspense items totaling 233,835 misto lire, which the defendant *Page 190 
had drawn against it in favor of sundry payees. Of these items, by far the largest was Adragnia's 60,000. Then came this sentence in the letter: "Application for license has now been filed and we trust to be able to effect payments in the course of a few days." There follows a statement of the free lire, emigrant lire and tourist lire accounts, and finally a summary of the general position of the defendant with the S.A.I. The defendant had a balance of misto lire 218,581, against which were the items in suspense pending license, 233,835. The defendant would be short misto lire 15,254, in the event the S.A.I. met all defendant's misto lire drafts. The defendant had overdrawn its emigrant lire and tourist lire accounts, but had a balance in other accounts of lire 300,000, worth about $13,000. The principal credit items were classified in the letter as A, B and C. The letter concludes as follows:
"There is not the slightest chance that the Istituto will allow us to effect payments in misto lire and emigrant lire for the balance not covered unless you authorize us and we, in our turn, apply for a license from the Istituto to carry such balances against the eventual sums in A, B, C which should, under ordinary circumstances, be credited back to you in New York. If, on receipt, you will cable us your authority, we will apply for a license here and if received, we will effect the payments and will notify you immediately."
The defendant, after the Presidential freezing order of June 13th, did not add to its balance of misto lire with the S.A.I. It does not appear that the defendant gave authority to S.A.I. to make the application for a license which the letter suggested, and of course defendant never received notice that the payment to Adragnia was effected. In fact, the defendant never made any further inquiry relating to the Adragnia account, never received another communication from S.A.I. about it, and knew nothing more of that item until, after the war, plaintiff demanded his money back. The defendant did not inform plaintiff of the situation disclosed by the letter of July 13, 1941.
Despite the difficulties of the situation, the S.A.I. made an effort to make payment to Adragnia. On July 15, 1941, *Page 191 
which was a month after the date of the cabled transfer, it wrote him — he lived in the south of Italy — that it had received instructions to pay him "certain funds for account of the American Express Company, Inc., New York," and asked information as a basis for applying for a license. It received the information and on August 6, 1941, applied to the Italian Exchange Office for a license. The application was returned not granted September 1st, with a request for more information about the original loan by Adragnia to plaintiff. The S.A.I. immediately wrote Adragnia for this information and he sent a relative to give the information orally. But it was necessary that the information be put in writing and this Adragnia was unwilling to do.
Plaintiff's judgment of $600 and no more is based on the hypothesis that the transaction in question, coupled with the decline in the value of lire between the summer of 1941 and the winter of 1945, caused an actual loss of about $1,800; that neither plaintiff nor defendant was at fault, and that it is equitable that plaintiff rather than defendant should bear the loss. The judgment is correct if the factual basis is solid.Katcher v. American Express Co., 94 N.J.L. 165 (E. A.
1919). But the proofs indicate that there was no loss to be borne by either party. In ordinary times, upon a transaction of this kind, the correspondent, upon receipt of instructions to pay, charges the defendant's account with the lire which it is called upon to pay. The correspondent then buys a postal money order and mails it to the payee — or takes other suitable means for making the lire available to him. If payment fails for any reason, the correspondent obtains redemption of the money order and recredits the lire to the account of defendant. That credit is worth to defendant only the amount it will buy in dollars payable in New York. If lire have declined, a loss results. But in the summer of 1941, the S.A.I. was following the practice of entering in a suspense account the defendant's orders to pay, and not charging them to defendant's account until, in each case, it obtained from the Instituto license to pay. And not until it got a license did it buy a postal money order, or otherwise change *Page 192 
its position. Since the S.A.I. did not succeed in getting a license to pay Adragnia, it took no further steps in the matter. The S.A.I. is not out of pocket — except for minor clerical expense — on account of the Adragnia transaction, and so cannot call upon defendant for reimbursement.
The defendant likewise has suffered no loss growing from this item of business. The S.A.I. did not charge defendant's account with Adragnia's 60,000 lire, and so there was no occasion to recredit defendant's account at some later day with depreciated lire. While defendant did enter a credit in its own books of 60,000 misto lire in favor of the S.A.I., it could always reverse the entry, so that its books would conform to the record of its correspondent. The defendant did not buy lire to cover the Adragnia transfer. It bought no misto lire at all after June 12, 1941 (the day before plaintiff called on the Passaic agent of defendant), and it does not appear to have bought any kind of lire after that day Nor can it be said that the defendant, in order to maintain a balance with S.A.I. from which Adragnia might be paid, refrained from drawing its funds from the S.A.I. in the summer of 1941. The Italian government did not permit withdrawals. Defendant, we assume, has sustained a considerable loss in lire, but the plaintiff's attempted transfer was not a factor in the loss. The defendant is enriched in the sum of $2,432 paid it by plaintiff, offset only by cable tolls and reasonable service fees. Defendant should make restitution.Aachen Munich F.I. Co. v. Guaranty Trust Co., 27 F.2d 674
(C.C.A.2d 1928).
The defendant has also been negligent in its relation with plaintiff. Ordinary banking practice required that defendant either maintain a balance with its correspondent, the S.A.I., equal to all its unpaid drafts upon that correspondent, or else have a definite agreement with its correspondent for the extension of credit sufficient to meet its drafts. The defendant seems to have failed to do so. We do not stress this failure, however, since it is very likely that payment to Adragnia would not have been effected even though defendant's balance with the S.A.I. had been ample. Again, the defendant *Page 193 
learned on August 5, 1941, that at least up to July 13th the S.A.I. had neither paid Adragnia nor obtained a license to do so. The fact that this was a cable transfer was notice to defendant that time was probably an essential factor. Gravenhorst v.Zimmerman, 236 N.Y. 22, 139 N.E. 766, 27 A.L.R. 1465
(1923). The letter from the S.A.I. was not entirely clear in one respect. At one place it said, "Application for license has now been filed and we trust to be able to effect payments in the course of a few days." And at the end of the letter, "There is not the slightest chance that the Instituto will allow us to effect payments * * *." And if certain events happen, "we will effect the payments and will notify you immediately." Upon receipt of this letter, defendant should have notified plaintiff of the situation and inquired what he wanted the defendant to do.Gage v. Boston National Bank, 257 Mass. 449, 154 N.E. 74,48 A.L.R. 1214 (1926). The defendant failed in this respect also. In this connection should be noted that plaintiff received a letter from Adragnia about the middle of July, 1941, stating that he had not received the money. Thereupon, plaintiff called on defendant's agent in Passaic and was assured that the company would investigate. He called two or three times more but never received any information.
Defendant relies on one of the paragraphs of the contract which is printed on the back of the receipt that plaintiff was given in June, 1941:
"If for any reason the credit covered by the foreign remittance herein is returned or recredited to the issuer, the remitter agrees to accept refund in the amount of the equivalence in United States Dollars of the amount of the foreign money credit based on the current buying rate in New York on the date of the refund less any charges and expenses of the issuer."
As we have already pointed out, it does not appear that the remittance in suit was ever charged against or "returned or recredited" to the defendant. Again this clause does not exempt the defendant from liability for its own negligence. The "date of the refund" will be taken to mean the date refund should have been made. *Page 194 
Because of wartime conditions, communications between this country and Italy were very slow in the summer and fall of 1941. A period of two months after August 5, 1941, would seem to have been a reasonable time within which the defendant might have straightened out this matter and made a refund to plaintiff. The value of lire was about the same in October as when plaintiff made his purchase in June. Plaintiff should have judgment for $2,431.85 less cable tolls and reasonable service charges, together with interest from October 5, 1941.
In addition to the cases cited above, we refer to AmericanUnion Bank v. Swiss Bank. Corp., 40 F.2d 446 (C.C.A.2d 1930); Burke v. National Shawmut Bank, 187 N.E. 114 (Mass. 1933), and to references in 9 C.J.S. 367 et seq., and inAnnotation, 69 A.L.R. 673.
Reversed and remanded for further proceedings in accordance with this opinion.