The order of the district court will be affirmed.

EQUIMARK COMMERCIAL FINANCE
COMPANY, Appellant,

v.

C.I.T. FINANCIAL SERVICES CORPO-
RATION (Formerly Universal C.I.T.
Credit Corporation).

No. 86–3478.

United States Court of Appeals,
Third Circuit.

Argued Feb. 17, 1987.

Decided March 2, 1987.

Jerome M. Libenson (argued), Mark L. Glosser, Mary Anne McKeen, Lampl, Sable, Makoroff & Libenson, Pittsburgh, Pa., for appellant.

George M. Cheever (argued), David M. Aceto, Kirkpatrick & Lockhart, Pittsburgh, Pa., for appellee.

Before GIBBONS, SLOVITER, Circuit Judges, and SCIRICA,* District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

In this action Equimark Commercial Finance Company (Equimark) seeks to recover a portion of a security account held by C.I.T. Financial Services Corporation (C.I.T.) established under a contract between C.I.T. and Equimark's assignor, United Dealers Corporation (United). The district court gave summary judgment for C.I.T., holding that there was no genuine issue of fact that C.I.T. was entitled to retain the amounts in the account because of various contractual defaults by United, and that C.I.T. did not waive this right. Our review of the grant of summary judgment is plenary. *See Maldonado v. Ramirez,* 757 F.2d 48, 49 (3d Cir.1985); *Kahn v. United States,* 753 F.2d 1208, 1210 (3d Cir.1985).

## I.

### Facts

United is a financing subsidiary of Swift Industries, Inc. (Swift), which was engaged along with various of its affiliates in the manufacture and retail sale of precut and prefabricated houses. United offered mortgage loans to Swift's retail customers. In an agreement dated April 12, 1967 ("Portfolio Agreement"), United sold a number of these obligations (so-called "paper") to C.I.T., and in another agreement dated the same day ("Home Financing Agreement"), United promised to give C.I.T. the right of first refusal on its subsequent sale of these obligations under essentially the same terms as the Portfolio Agreement.

Both agreements contained a provision for a "holdback account" which served as collateral for United's obligations, and which contained $516,750.36 at the inception of the agreement. C.I.T. was entitled to retain in that account 5% of the aggregate gross unpaid balance on the paper as to which there was no default and 100% of the unpaid balance on paper that was 90 days overdue or as to which there had been a default by United. At the end of each quarter, C.I.T. was to remit to United the amount by which the holdback account exceeded the amount C.I.T. was entitled to retain. The holdback account was subject to a minimum balance of $100,000 or the aggregate gross unpaid balance then outstanding on the paper, whichever was less.

Paragraph II.D.(3) of the Portfolio Agreement and Paragraph IV.B.(3) of the Home Financing Agreement also provided that:

> If for any reason [United] or any of its affiliated corporations is in default to [C.I.T.] ..., then, notwithstanding any other provisions herein or elsewhere [C.I.T.] may retain all monies in said holdback account up to the aggregate gross unpaid balances then outstanding on the paper ..., until all of the paper and all of the outstanding obligations of [United] to [C.I.T.] ... have been fully paid, and [C.I.T.] may, at its option, charge any of said obligations of [United] against the holdback account, and thereafter notify [United] of such charge.

App. at 17–18, 254.

From 1975 through 1977, United breached its obligations under the contracts in various respects: beginning at the end of United's fiscal year ending March 31, 1975, and thereafter, United failed to provide C.I.T. with the requisite financial statements, and those that were received were not certified as required by Paragraph V.H. of the Portfolio Agreement and Para-

---

* Hon. Anthony J. Scirica, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

graph VII.G. of the Home Financing Agreement.

On May 20, 1975, United assigned its interest in the holdback account to Equimark, in violation of Paragraph X of the Portfolio Agreement and Paragraph XII of the Home Financing Agreement. C.I.T. was notified of the assignment in a letter dated December 1, 1976.

On January 17, 1977, Swift and its affiliates, including United, filed a Petition for an Arrangement under Chapter XI of the Bankruptcy Act of 1898. Under Paragraph VII.C. of the Portfolio Agreement and Paragraph IX.C. of the Home Financing Agreement, the filing of the petition constituted at C.I.T.'s option an event of default. C.I.T., a secured creditor, did not participate in the Chapter XI proceedings. On July 21, 1977, a plan for arrangement was confirmed for the Swift companies. Equimark, the assignee, and its parent, Equibank, provided funds for the reorganization and they took a security interest in substantially all the assets of the Swift companies under a master loan agreement.

United also defaulted on the net worth requirement of Paragraph V.G.(1) of the Portfolio Agreement and Paragraph VII. F.(1) of the Home Financing Agreement, since as of March 31, 1977 and continuing thereafter United's net worth has been less than the lesser of $2,300,000 or the contingent liabilities of United and Swift to C.I.T.

Finally, on several occasions in July 1975 and thereafter, C.I.T. requested United to honor its obligations under Paragraph VII.A. of the Portfolio Agreement and Paragraph IX.A. of the Home Financing Agreement to repurchase paper that was 90 days overdue. In each case, United declined to repurchase the delinquent paper, and instead requested C.I.T. to charge the holdback account for the balance due on the paper. In late May or early June, 1977, C.I.T. agreed to assign all future delinquent paper to United and to charge the holdback account for any resulting deficiency, and United agreed to collect the balance due on the delinquent paper and remit the proceeds of collection up to the amount of the deficiency to C.I.T. for re-

crediting to the holdback account. C.I.T. thereafter assigned several items of delinquent paper to United under the agreement. However, in most of these cases, United either failed to reimburse C.I.T. for the full amount of the delinquency, or failed to remit any of the collection proceeds to C.I.T. Under Paragraphs VII.C. of the Portfolio Agreement and Paragraph IX.C. of the Home Financing Agreement, failure by United to perform its repurchase obligations constituted at C.I.T.'s option an event of default.

Although C.I.T. purchased approximately 388 items of paper under the Home Financing Agreement from June, 1968 through December, 1975, in 1976 C.I.T. purchased only 3 items of paper, and in 1977 C.I.T. purchased no paper from United. C.I.T. also made no disbursements to United from the holdback account in 1977 or any time thereafter. In August, 1977, after emergence from Chapter XI, representatives of United, Swift and C.I.T. met to discuss ways to restore C.I.T.'s level of purchases from United, and to increase the attractiveness of United's loan terms to prospective borrowers. As a result of these negotiations, C.I.T. agreed to accept paper with a longer term and lower interest rate than it had previously accepted. C.I.T. also agreed to reduce from 5% to 3% the amount held back from each purchase. However, the holdback account minimum was increased from $100,000 to $400,000. In a letter dated January 9, 1978 memorializing the agreement, a C.I.T. representative also stated that, "Overall holdback retention ... will remain 5% of the aggregate gross unpaid balances outstanding on all current paper plus 100% of the aggregate gross unpaid balances on all 'non-current paper' as defined in the underlying agreement ... dated April 12, 1967...." App. at 291.

On August 20, 1980, C.I.T. was informed that Equibank and Equimark had foreclosed on all the assets of the Swift companies with the intention of liquidating the assets. Thereafter, C.I.T. received no further financial statements from Swift or United. C.I.T. continued, however, to make pur-

chases from United, and to assign delinquent paper to United for collection under the agreement made in late May or early June, 1977. As of February 22, 1985, the balance in the Regular Holdback Account was $407,797.88, and the balance of the total paper outstanding was $2,636,500.26.

On May 22, 1985, Equimark, as assignee of United, brought the present action to recover the funds in the holdback account to the extent that they exceed the greater of $100,000 or 5% of the total unpaid balance outstanding. C.I.T. moved for summary judgment, claiming a right to retain all amounts in the holdback account as a result of United's defaults, and claiming alternatively that by the agreement memorialized in the January 9, 1978 letter, the holdback account minimum was increased to $400,000. The district court referred the motion to Magistrate Ila Jeanne Sensenich. The magistrate recommended that C.I.T.'s motion be granted, and the district court adopted the magistrate's report and recommendation and granted C.I.T.'s motion.

## II.

### Discussion

Summary judgment can be granted only if there is no genuine issue of material fact. Fed.R.Civ.P. 56(c); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 2511. However, if the evidence is "merely colorable" or is "not significantly probative," summary judgment may be granted. *Id.*

In a summary judgment action, the moving party has the initial burden of identifying evidence which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, — U.S.

—, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, where the nonmoving party bears the burden of proof, it must by affidavits or by the depositions and admissions on file "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Id.* at 2552–53.

C.I.T. argues that United's continued defaults, including its failure to remit the proceeds of collection of the paper assigned it by C.I.T. and its filing of a petition in bankruptcy, entitled it to "retain all monies in said holdback account up to the aggregate gross unpaid balances then outstanding on the paper plus any other outstanding obligations for which [C.I.T.] may employ the holdback account" under Paragraph II.D.(3) of the Portfolio Agreement and Paragraph IV.B.(3) of the Home Financing Agreement. Paragraph VII.C. of the Portfolio Agreement and Paragraph IX.C. of the Home Financing Agreement define "default":

> [United]'s failure at any time to perform any of its repurchase obligations hereunder ..., or within 30 days after written notice thereof by [C.I.T.], [United]'s failure to perform any of its other obligations set forth in this Agreement, or the filing by or against [United] of a petition in bankruptcy or for reorganization or for appointment of a receiver for [United] or for the dissolution of [United], shall at [C.I.T.]'s option constitute an event of default hereunder and thereupon [United]'s repurchase obligation shall become immediate and absolute in relation to the total unpaid balances on all paper....

App. at 34–35, 270.

 Equimark argues that summary judgment was inappropriate because there are genuine issues of material fact as to (1) whether C.I.T. actually "froze" the holdback account in response to United's defaults, and (2) whether C.I.T. waived United's defaults by failing to affirmatively claim a default and by subsequently accepting United's performance. With respect to Equimark's first contention, the agreement states that C.I.T. may "retain" all funds in

the holdback account upon default by United. No magic step of "freezing" is required for this purpose. It was accomplished by C.I.T.'s failure to disburse funds from the account, regardless of its motivation, or whether any disbursements were in fact required. We also reject Equimark's other contention that C.I.T. had no right to retain the holdback account funds because it failed to assert the defaults by United. Even assuming that under the definition of "default" set forth above, notice to United by C.I.T. concerning the breach of the net worth obligation, failure to provide financial statements, and assignment to Equimark was required before C.I.T. could retain amounts in the holdback account because of such defaults, no such notice was required before such action could be taken on account of the defaults of failure to repurchase overdue paper and the filing of a petition under the Bankruptcy Act. The latter events thus automatically resulted in default by United and gave C.I.T. the option to retain amounts in the holdback account.[1]

We also conclude that C.I.T. has not waived its right to retain the holdback account funds. Under New York law, which the parties agree is applicable, a waiver is an intentional relinquishment of a known right. *Alsens American Portland Cement Works v. Degnon Contracting Co.,* 222 N.Y. 34, 37, 118 N.E. 210, 210 (1917). The burden of proof is on the person asserting the waiver. *See id.* Although the non-defaulting party may lose the right to rescind the contract for failure to act promptly upon default, *see Emigrant Industrial Savings Bank v. Willow Builders,* 290 N.Y. 133, 144, 48 N.E.2d 293, 299 (1943); *Gravenhorst v. Zimmerman,* 236 N.Y. 22, 38, 139 N.E. 766, 772 (1923), the

failure to rescind does not constitute a waiver of other remedies for breach. *General Supply & Construction Co. v. Goelet,* 241 N.Y. 28, 36, 148 N.E. 778, 779 (1925); *McMaster v. State,* 108 N.Y. 542, 552–53, 15 N.E. 417, 421 (1888). Since C.I.T. made no disbursements from the holdback account from at least 1977, it relinquished none of its rights in that account. Equimark argues that a waiver can be found in C.I.T.'s failure to assert a claim in United's 1977 bankruptcy proceedings. However, Equimark has given no evidence that United retained any interest in the account. United's rights in the holdback account were assigned to Equimark on May 20, 1975, more than one year before the bankruptcy proceedings, and therefore, the account was not part of the estate in bankruptcy. *See* 11 U.S.C.App. §§ 107(d), 110(a) (repealed 1978). Equimark also argues that a waiver can be found in C.I.T.'s "continuing and on-going course of business with United." Appellant's Brief at 16. However, that course of business had markedly diminished and, in any event, does not suggest that C.I.T. was acquiescing in United's conduct in light of C.I.T.'s continued protection provided by the holdback account.[2]

### III.

#### Conclusion

For the reasons stated above, the order of the district court granting summary judgment in favor of C.I.T. will be affirmed.

---

**1.** Furthermore, Equimark's argument that C.I.T. did not retain amounts in the holdback account in response to United's defaults and that it never affirmatively claimed the defaults is not completely accurate. In a letter dated December 16, 1982 from Warren H. Cortland, Vice President of C.I.T. to John C. Boucher, Jr., of Equibank, C.I.T. declined to disburse amounts in the holdback account, stating:

As you are aware, we have not disbursed funds from the Holdback Account for some

time as we feel a freeze of the "Holdback" is justified under the terms of the referenced Agreement.
App. at 205.

**2.** Because we find no waiver by C.I.T. of its right to retain amounts in the holdback account, we do not address its alternative argument that the 1977–78 agreement increased the minimum balance in the holdback account to $400,000.