**Gene D. WHITE, Plaintiff,**

v.

**Captain Albert OTTINGER, Julio M. Algarin, Deputy Warden, Lawrence V. Roth, Jr., Warden, Montgomery County Prison Board, and Montgomery County, Defendants.**

**No. CIV.A.01–924.**

United States District Court,
E.D. Pennsylvania.

Aug. 9, 2006.

Frank P. Murphy, Murphy, Woodward & Haskins, Norristown, PA, for Plaintiff.

Douglas B. Breidenbach, Jr., Breidenbach, Breidenbach, Pottstown, PA, for Defendants.

## MEMORANDUM & ORDER
### MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

Plaintiff Gene D. White filed suit pursuant to 42 U.S.C. §§ 1983 and 1985 for alleged misconduct by Officers Algarin, Ottinger, and Roth, the Montgomery County Prison Board, and Montgomery County. Presently before the Court is the defendants' motion for summary judgment.

For the reasons set forth below, the motion is granted in part and denied in part.

## II. BACKGROUND

### A. Parties

Plaintiff, Gene D. White, was incarcerated in the Montgomery County Correctional Facility ("MCCF") from October 30, 1997 to March 22, 2000 after having been convicted of conspiracy to commit burglary and possession of marijuana with the intent to distribute. Compl. ¶¶ 10, 11. The events relevant to this suit began in November 1998 when White was eighteen years old. White Dep. 33.

The defendants are: (1) Albert Ottinger, Captain of the prison guards at MCCF; (2) Julio Algarin, the Deputy Warden at MCCF; (3) Lawrence Roth, the Warden at MCCF; (4) the Montgomery County Prison Board; and (5) Montgomery County.

The Court notes that when this suit was instituted, White named Eileen Mayfield as a defendant. At all times relevant to this suit, she was a correctional officer at MCCF, and was about thirty-six or forty years old. Pl.Ex. B, White Dep. 33; Pl. Ex. C, Def. Ex. D, Mayfield Letter. In 2000, the Montgomery County District Attorney's Office instituted criminal charges against Mayfield, including institutional sexual assault based on her activities at MCCF.[1] Ultimately, all the criminal charges against Mayfield were *nolle prossed.* During the pendency of the criminal charges, Mayfield's employment by MCCF was terminated, Roth Dep. 32, and she declared bankruptcy, resulting in

---

**1.** White testified as a witness for Montgomery County in the criminal case against Mayfield. White Dep. 86. White expressed frustration over the fact that, although he had testified for Montgomery County in its criminal case against Mayfield, the county is now opposing his claims for relief. He stated: "[I]t was inappropriate what happened in the prison. Should have never happened. Should have been handled differently. If the county is going to force me testify against somebody they're pressing charges on, I don't understand how they can turn around and fight me and say I'm wrong." *Id.* at 85.

the discharge of White's claims against her, among other claims. By reason of the bankruptcy discharge, with White's agreement, by Order dated December 5, 2005, the Court granted Mayfield's motion to dismiss. She is no longer a defendant in this case.

## B. Facts

The evidence in this case may be summarized as follows: According to White, Mayfield had a decade-long history of sexually molesting young male inmates and having sexual relationships with correctional officers. Some evidence in the record supports White's characterization of Mayfield's behavior: In 1993 or 1994, an inmate named Clifton Glenn contacted the warden after his release from MCCF and accused Mayfield of sexual abuse. Def. Mem. 13. Thereafter, Mayfield had a sexual relationship with a former inmate in violation of county rules and policies. Algarin Dep. 105–108. Although Mayfield reported this relationship to Algarin after the former inmate stole her gun, no disciplinary action was taken against her. *Id.* In addition, according to Algarin, "it was common knowledge" that Mayfield had "more relationships with staff members." Algarin Dep. 49, 91; White Dep. 51–52.[2]

In November or December 1998, White signed up to work in the maintenance department of MCCF. White Dep. 89; Def. Ex. U, "Institutional Parole Summary." Soon thereafter, Mayfield informally reassigned White to work in the commissary, which she supervised. White Dep. 89–91, 118–19. During the three or four months that White worked in the commissary— from about November or December 1998 to February 1999—Mayfield sexually assaulted White in the commissary. *Id.* at 11–18, 40–42, 88–91. Initially, she flirted with him, and then she wrote provocative letters to him, ultimately as many as fifteen to twenty. *Id.* At some time after she wrote the first letter, Mayfield sexually assaulted White by rubbing her body against his, grabbing and touching his body, and forcibly performing oral sex. *Id.* Thereafter, Mayfield forcibly performed oral sex on White on four or five occasions. *Id.* White testified that, although he found "the act [of oral sex] itself" to be "pleasurable," he felt that he had no choice in the matter. *Id.* at 24–25, 95. He was afraid that, if he did not cooperate, Mayfield would retaliate by making him lose his job at the commissary, accusing him of prison misconduct, inflicting disciplinary action, and/or delaying his parole. *Id.* at 18, 21, 22, 32, 42, 121.

On two or three occasions, White asked the head of the maintenance department, Hoy, if he could continue to do maintenance work, instead of working in the commissary. *Id.* at 115–17. Hoy declined White's request, saying, "No, you have to work for Mayfield." *Id.* at 118. White testified that those familiar with the situation—including correctional officers and inmates in the maintenance department— called him "commissary boy" and other "stuff like that." *Id.* at 118.

Because of the nature of their relationship, Mayfield allowed White to take goods from the commissary, as long as he informed her of what he was taking. White Dep. 40, 44–45. White testified that on February 25, 1995 he took three pairs of new boxer shorts from the commissary with Mayfield's permission. *Id.* at 44–45. He knew that, under prison rules, he was

---

**2.** The record confirms that Mayfield had sexual relationships with at least two officers at MCCF. Algarin admitted to having an intimate relationship with Mayfield in 1979. Al-

garin Dep. 48–51. Officer Edwin Negron fathered a child with Mayfield. Algarin Dep. 91–92; Roth Dep. 16–17; White Dep. 51–52.

not permitted to have the boxer shorts, so he wore the three pairs on top of his own in an effort to conceal them. *Id.* at 45–46. As White returned to his prison cell from the commissary, an officer strip searched White and discovered the additional boxer shorts. *Id.* at 47–48.

As a result, White was placed in solitary confinement, and charged with theft, lying to a correctional officer, and possession of contraband from the commissary. *Id.* at 49–50, 55. He appeared before the Disciplinary Board, and was found guilty of all charges. *Id.* at 50–57. White testified that he did not present his best defense— that Mayfield had given him the boxer shorts as part of their sexual relationship—before the Disciplinary Board because one of its three members, Officer Edwin Negron, had fathered a child with Mayfield, and White feared retaliation from him. *Id.* at 51–52; Algarin Dep. 91–92; Roth Dep. 16–18.

While White was in solitary confinement, he was able to attract the attention of Ottinger, with whom White shared the story of how Mayfield gave him the boxer shorts.[3] White Dep. at 59–60; Ottinger Dep. 11–16. During their conversation, White presented Ottinger with letters that Mayfield had written, which corroborated his story of Mayfield's sexual misconduct. White Dep. 60–61. White testified that he turned over "between 15 and 20" letters to Ottinger. *Id.* at 28, 59. Only three letters are available in the record.[4] Def. Ex. C; Pl.Ex. C. Ottinger testified that White feared retaliation from Officer Negron be-

fore the Disciplinary Board. Roth Dep. 17–18.

After receiving the letters, Ottinger showed them first to Captain Martin and then to Algarin. Algarin Dep. 15–17; Ottinger Dep. 20, 38. When Ottinger asked Mayfield whether she had given White the boxer shorts, she denied involvement in the matter. Ottinger Dep. 12, 26–27, 54–56. Ottinger testified that he believed her because he "didn't want to think that staff would do that" and he "had more experience with inmates trying to concoct stories like this trying to get out of trouble." *Id.* at 14, 27. Ottinger, nonetheless, had "concerns . . . about an inappropriate relationship with a staff member and an inmate." *Id.* at 24.

When Algarin confronted Mayfield about the letters, she denied having inappropriate contacts with White, and explained the letters as "a fantasy, that nothing happened, that it was just a letter." Algarin Dep. 25. Algarin testified that he believed Mayfield at that time. *Id.* at 44, 76. Ottinger issued an employee violation report dated February 26, 1999 against Mayfield on the ground that her letters to White reflected undue familiarity with an inmate in violation of MCCF rules and regulations. Ottinger Dep. 69–70; Algarin Dep. 17–20.

According to White, both Ottinger and Algarin promised him that his internal conviction for theft of the boxer shorts and lying to a correctional officer would be removed from his "prison jacket"—prison lingo for the outside of an inmate's file— prior to his parole hearing. White Dep.

---

**3.** The record is unclear as to whether White's communication with Ottinger occurred before or after the Disciplinary Board's adjudication process. According to White, it was before he appeared before the Disciplinary Board. White Dep. 57. According to Ottinger, it was after White appeared before the Disciplinary Board. Ottinger Dep. 22

**4.** White alleges that prison officials probably destroyed some letters, which the defendants deny. The Court notes that in the third letter from Mayfield which is included in the record, Mayfield writes, "this is letter 6. How were the other letters?" Pl.Ex. C; Def. Ex. C.

63. Algarin denied making such a promise. Algarin Dep. 32–33, 75–76.

In July 1999, White appeared before the Parole Board in an effort to secure the earliest possible release date, but was denied parole. According to White, the denial was based on the internal convictions for theft and lying to a correctional officer which were not removed from his prison jacket. *Id.* at 66, 71–74, 104–105. The Institutional Parole Summary (ISP) states that "[p]arole cannot be recommended at this time due to inmate's positive drug urinalysis and removal from the Work Release program." [5] White served an additional seven months at MCCF.

During the pendency of the criminal case against Mayfield, instituted in 2000, Algarin learned that Mayfield had threatened multiple inmates. *Id.* at 71–72. Algarin "came to believe" that White and Mayfield had a physical relationship based on what he heard, read, and saw on television, and based on the fact that "there was more than one inmate that came forward" to the District Attorney's Office against Mayfield. Algarin Dep. 78, 79, 80, 103.

### III. PROCEDURAL HISTORY

White filed a Complaint in this Court on February 23, 2001. By Order dated May 25, 2001, the Court ruled on defendants' Motion to Dismiss, which was granted in part and denied in part. In that Order, the Court dismissed the state law claims against the Montgomery County Prison Board and Montgomery County, and dismissed the state law claims based on negligence against the individual defendants.

By letter dated August 13, 2001, all counsel requested that the case be placed in the civil suspense file until the criminal charges against Mayfield were resolved. *See* Letter from Frank P. Murphy, dated August 13, 2001. That was accomplished by Order dated August 20, 2001. On October 25, 2005, after the criminal case against Mayfield was *nolle prossed*, this case was returned to the Court's active docket. On May 15, 2006, defendants filed the instant motion for summary judgment. White responded on June 8, 2006.

### IV. WHITE'S CLAIMS

White seeks redress under 42 U.S.C. §§ 1983 and 1985 for violations of his federal constitutional rights. He also asserts two related state law claims. The following counts survived the Court's Order of May 25, 2001:

In Count One, White alleges that all the defendants violated his substantive and procedural due process rights. Specifically, White argues that Algarin and Ottinger—acting as employees and agents of Montgomery County and the Montgomery Country Prison Board—failed to expunge the internal convictions from White's prison jacket, as agreed, which resulted in White suffering an unfair hearing before the Parole Board in violation of his due process rights.

In Count Two, White argues that all the defendants violated his equal protection rights. He claims that had he been female, the defendants would have undertaken serious investigation into the situation. He argues that because he is male, and on account of his gender, the defendants

---

**5.** Early during his incarceration at MCCF, White was approved for the prison's Work Release program. On November 6, 1998, following his return to prison after a release period, he was administered a urine test. The results were positive for the presence of cocaine, opiates, and morphine. White was issued a prison misconduct charge and found guilty. Def. Ex. A, "Misconduct Report for Gene White, dated November 6, 1998"; White Dep. 77–79.

failed to afford him Equal Protection of the law as guaranteed by the Fourteenth Amendment.

In Count Three, White contends that all the defendants violated his Eighth and Fourteenth Amendment rights, because the sexual assaults that he suffered amounted to cruel and unusual punishment and because the defendants were deliberately indifferent to his plight. In Count Four, White seeks redress under 42 U.S.C. § 1985 on the ground that Algarin, Ottinger, and Roth conspired to deprive him of equal protection and privileges of the law. In Count Five, White claims that Algarin, Ottinger, and Roth intentionally inflicted emotional distress on him. Finally, in Count Eight, White alleges that Algarin, Ottinger, and Roth falsely imprisoned him, first in solitary confinement for thirty days and then for an additional seven months at MCCF as a result of the denial of his parole.

## V. STANDARD OF REVIEW

A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

"In determining the facts, the court should draw all reasonable inferences in favor of the nonmoving party." *Id.* at 255,

106 S.Ct. 2505; *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir.2004). The nonmoving party, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982); *see also Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (stating that summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative"). In a summary judgment motion, the moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. However, where the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir. 1987), *citing Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. If reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

## VI. DISCUSSION

### A. Claims Under 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that defendants, acting under color of state law, deprived the plaintiff of rights secured by the Constitution or federal statutes. 42 U.S.C. § 1983. In the instant case, White alleges, and defendants do not deny, that they acted under color of state law. *See* Def. Mem. 6; Pl. Mem. 6. Accordingly, the Court turns to the next step in analyzing a § 1983 claim, which "is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). The Court begins this task by identifying the

specific constitutional rights allegedly infringed by Montgomery County and the Montgomery County Prison Board. Then, the Court examines the specific constitutional rights allegedly infringed by Algarin, Ottinger, and Roth.

## B. Liability of Montgomery County and the Montgomery County Prison Board

White alleges in three counts that Montgomery County and the Montgomery County Prison Board are liable for violating his substantive and procedural due process rights (Count One), his equal protection rights (Count Two), and his Eighth and Fourteenth Amendment rights (Count Three).

■ To succeed on these claims under 42 U.S.C. § 1983, White must demonstrate that Montgomery County and the Montgomery County Prison Board had a policy or custom that supported the alleged violations of his rights. *Monell v. Dept. of Social Services,* 436 U.S. 658, 692–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Section 1983 liability attaches to a municipality only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. 2018.

A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law. *Monell,* 436 U.S. at 690, 98 S.Ct. 2018 (quoting *Adickes v. S.H.*

*Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). *Accord Anela v. City of Wildwood,* 790 F.2d 1063, 1067 (3d Cir.1986), *cert. denied,* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986). In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom. *Andrews v. Philadelphia,* 895 F.2d 1469, 1481 (3d Cir.1990). "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018.

■ After careful review of the record, the Court concludes that there is no evidence which supports White's allegation that Montgomery County and the Montgomery County Prison Board had a policy or custom that resulted in violations of his substantive and procedural due process rights, equal protection rights, and Eighth Amendment rights. Indeed, White concedes that "there is no written policy condoning Mayfield's actions," and acknowledges that Montgomery County and the Montgomery County Prison Board cannot be liable for merely employing Mayfield. Pl. Mem. 8–9. White has offered only bare assertions and conclusory allegations against Montgomery County and the Montgomery County Prison Board, which are insufficient to survive summary judgment. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982); *see also Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, the Court grants summary judgment in favor of Montgomery County and the Montgomery County Prison Board as to all of White's claims.

## C. Liability of Algarin, Ottinger, and Roth

The Court next examines the potential liability of Algarin, Ottinger, and Roth.

For the reasons set forth below, the Court grants summary judgment in favor of the defendants on Counts One, Two, Four, and Eight, but denies summary judgment on Counts Three and Five.

### 1. Count One: White's Substantive and Procedural Due Process Claim

■ In Count One, White alleges that Algarin and Ottinger violated his substantive and procedural due process rights under the Fourteenth Amendment by not expunging the internal convictions from White's prison jacket, which allegedly resulted in White suffering an unfair hearing before the Parole Board.

The Court concludes that White has produced no evidence to support these allegations. During his deposition, White admitted that he knowingly took stolen property (i.e., the boxer shorts) from the commissary and then misrepresented the nature of his actions to a correctional officer. White Dep. 40–55. In light of White's admission of guilt, he had no right to have the internal charges for those offenses removed from his prison jacket.

White claims that Mayfield's complicity in helping him to steal the boxer shorts somehow absolves him of his guilt and the charges against him. That argument is obviously without merit. In Pennsylvania, it is a crime to receive stolen property. *See* Theft by Receiving Stolen Property, 18 Pa.C.S. A. Section 3925 ("[A] person is guilty of theft if he intentionally receives, retains, or disposes of moveable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed of with intent to restore it to the owner."). When White left the commissary with the three pairs of boxer shorts and with the knowledge that the boxer shorts were not properly his, he committed theft. There is no basis for White's claim that the internal charges against him were false.

Moreover, although White asserts that the boxer shorts incident resulted in the denial of his parole, there is no evidence to support that claim. The Institutional Parole Summary recommendation that parole be denied was based on White's positive drug urinalysis and removal from the Work Release program in November 1998. Def. Ex. A, "Misconduct Report for Gene White, dated November 6, 1998"; White Dep. 77–79. In addition, Algarin, Roth, and Ottinger testified that the positive urinalysis during the Work Release program was likely the determinative factor in the denial of White's parole, not the stealing of boxer shorts. Algarin Dep. 84–85; Roth Dep. 20, 24; Ottinger Dep. 30, 32–36.

There are no contested genuine issue of material fact with regard to the claims White raises in Count One. Thus, the Court grants summary judgment in favor of Algarin and Ottinger on this count.

### 2. Count Two: White's Equal Protection Claim

■ In Count Two, White alleges that Algarin, Ottinger, and Roth violated his equal protection rights under the Fourteenth Amendment because they did not investigate his claims with the appropriate degree of seriousness. He argues that, had he been female, the defendants would have undertaken a thorough investigation.

To succeed in a claim under 42 U.S.C. § 1983 for denial of equal protection, a plaintiff must prove the existence of purposeful discrimination. *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This means that the plaintiff must demonstrate that he "received different treatment from that received by other individuals similarly situated." *Kuhar v. Greensburg–Salem School*

*Dist.*, 616 F.2d 676, 677 n. 1 (3d Cir.1980). "Specifically, to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender." *Andrews v. Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990) (citing *Bohen v. City of East Chicago*, 799 F.2d 1180, 1186–87 (7th Cir.1986)).

After a careful review of the record, the Court concludes that White has presented no evidence to support his claim that Algarin, Ottinger, and Roth violated his equal protection rights on account of his sex or gender. No testimony from these defendants suggests they would have responded with more attention to a female inmate's complaints of sexual harassment, nor does any evidence suggest these defendants pay more attention to the well-being of female inmates. White's bare assertions, conclusory allegations, and suspicions are insufficient to survive defendants' motion for summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982); *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, the Court grants summary judgment in favor of Algarin, Ottinger, and Roth on Count Two.

### 3. Count Three: White's Eighth and Fourteenth Amendment Claim

In Count Three, White contends that Algarin, Ottinger, and Roth violated his Eighth and Fourteenth Amendment rights because the sexual assaults that he suffered amounted to cruel and unusual punishment. He alleges that Algarin, Ottinger, and Roth knew, or should have known, that Mayfield was likely to sexually assault him, but that they failed to take appropriate preventative measures and were deliberately indifferent to his plight. In response, Algarin, Ottinger, and Roth deny that the sexual assaults violated White's Eighth Amendment rights, and deny that they knew or should have

known about the alleged sexual assaults that White suffered. After carefully examining the record, the Court concludes that Algarin, Ottinger, and Roth are not entitled to summary judgment on Count Three.

 "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prison official violates the Eighth Amendment when two requirements are met: "the deprivation alleged must be, objectively, 'sufficiently serious,'" and the prison official must have a "sufficiently culpable state of mind." *Id.* at 834, 114 S.Ct. 1970. Courts have held that sexual harassment or sexual assault of an inmate by a prison guard can rise to the level of an Eighth Amendment violation. *See, e.g., Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir.1998) ("With regard to ... sexual assault claims, we have expressly acknowledged that an inmate has a constitutional right [under the Eighth Amendment] to be secure in her bodily integrity and free from attack by prison guards.") (internal quotations and citations omitted); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir.1997) ("allegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983."). The Court addresses the two requirements in turn.

 First, Algarin, Ottinger, and Roth argue that any sexual assaults that White suffered at the hands of Mayfield do not rise to the level of an Eighth Amendment violation. In support of their position, the defendants rely on *Freitas v. Ault*, 109 F.3d 1335 (8th Cir.1997). In *Freitas*, the district court, after a bench trial, found that the plaintiff, a male inmate, failed to establish a 42 U.S.C. § 1983 claim against

a female prison official for sexual harassment. The Court of Appeals affirmed on the ground that the plaintiff had freely consented to the relationship with the prison official and was not sexually harassed. The Court concludes that *Freitas* is distinguishable from this case on the present record because, unlike *Freitas*, in this case there are genuine issues of material fact related to whether the relationship between White and Mayfield was consensual.

In *Freitas*, the Eighth Circuit explained: [A] romantic relationship developed between the two [inmate Freitas and prison official Howard] that lasted several months. Mr. Freitas and Ms. Howard would meet in secluded areas of [the prison], where they would kiss, hug, and talk. At Ms. Howard's request, Mr. Freitas would write her "hot sexy" letters approximately every other day, and Ms. Howard occasionally dressed in tight skirts and high heels for Mr. Freitas's benefit.

Although the two discussed living together upon Mr. Freitas's release, Ms. Howard was apparently less serious about the relationship than Mr. Freitas, for she saw and slept with other men. After Mr. Freitas learned from Ms. Howard that a male companion would be staying with her over the weekend, he decided to inform Mr. Ault, the warden of NCCF, about the relationship. Mr. Freitas wrote Mr. Ault a letter informing him of the affair between the two in which he used the word "relationship" to characterize their interactions and stated that "I've been as much at fault" as Ms. Howard and that "this isn't all my fault."

*Id.* at 1336. The *Freitas* Court concluded that "[t]he record contains no evidence, other than Mr. Freitas's unsubstantiated assertions, supporting his claim that he succumbed to Ms. Howard's advances be-cause she was his boss and he feared the possible negative consequences of reporting her actions." *Id.* at 1339. Rather, the *Freitas* Court found "ample evidence supporting the trial court's finding that their relationship was consensual in the freest sense of the word." *Id.*

In contrast to the *Freitas* case, there is evidence in the instant case that the relationship between White and Mayfield was not consensual. The three letters written by Mayfield contain statements supporting White's allegations that Mayfield knew that she wielded power over White due to her status as a correctional officer and his status as an inmate, and used that power to maintain their sexual relationship. For example, she wrote:

- "Know what my fantasy is. I'll write about it over the weekend. Sorry your [sic] just going to have to wonder. *I guess that is where my power falls into play* (ha ha)." Def. Ex. C; Pl.Ex. C (emphasis added).

- "I have a lot to loose [sic] if anyone even things [sic] there is something going on. Promise me no one will know anything." Def. Ex. C, Pl.Ex. C.

- *"I know I can get away with a lot more than you can. I can touch you as much as I want and you can't do a thing. (You poor thing)* Oh how the teasing will be fun. Do you think you can handle it. I'm going to love every minute of it. If you don't think you can handle it let me know. I don't want to drive you nuts like you said I was doing. *Your just going to have to handle it because thats [sic] just the way I am. I will touch when I want to because I like it."* Def. Ex. C, Pl.Ex. C (emphasis added).

These statements corroborate White's testimony that Mayfield was sexually aggressive, and that she enjoyed the fact that

White could not "do a thing" to stop her advances.

Mayfield's letters also underscore the age disparity between Mayfield and White, and note Mayfield's puzzlement over why White did not resist her sexual conduct. During the period of the sexual assaults, White was eighteen years old, and Mayfield was thirty-six or forty years old. White Dep. 33 (identifying Mayfield's age as thirty-six); Mayfield Letter (identifying Mayfield's age as forty). In one of her letters, Mayfield highlights this age disparity, and admits that White's acquiescence to her advances "baffles" her:

> [W]e [i.e., women of Mayfield's age] all could be your mother. I really don't understand what your [sic] looking for. Your [sic] very young. You have a whole life in front of you. You should want to get your life together .... You should want someone near your age .... I have a son who is 21. And if he was involved with someone as old as me I would be upset..... [T]here is no future in being with a older lady when a man is so young. Maybe Im [sic] wrong. Correct me if I am. It just baffles me.

In another letter, Mayfield writes, "Why in the world are you interested in me? Your [sic] young and I'm 40 years old. That [sic] a question that puzzles me. All I can come up with is that I am the only female you are around." The Court concludes that these statements support White's allegations that his relationship with Mayfield was nonconsensual.

Likewise, White's own testimony emphasizes that his relationship with Mayfield was not consensual, and that he feared repercussions if he did not submit to her advances. He testified that he "didn't want to ... have a relationship with her or anything like that," and that he "was never the aggressor in any contact at all." White Dep. at 17, 36. For example, when Mayfield approached White before the first instance of oral sex, White testified that "[s]he just kissed the side of my face and my neck," but he did not kiss her back. *Id.* at 19. Due to Mayfield's power to exact punishment, her "intimidation," and his own "fear," White admitted that during the oral sex, he did not push Mayfield away, pull his pants up, or turn away. *Id.* at 21–22, 107. For the same reasons, and because Mayfield demanded it, White wrote her letters. *Id.* at 32. White further testified that he did not report the sexual assaults to a supervisor or a social worker because he "didn't want to lose [his] job," did not want be "put in the hole"—solitary confinement -, did not want to be fired by Mayfield, did not want to make Mayfield "angry" or "upset or mad," and did not want to "screw anything up" which might affect his parole. *Id.* at 18, 21, 32, 42, 121.

During the period of the sexual assaults, White testified that he was afflicted with "fear" and "stress." *Id.* at 96. He described "[f]eeling sick to my stomach.... Nervousness I'm going to get caught, I may get in trouble if something like this is going to occur." *Id.* at 83. When asked, "Did she [Mayfield] ever hold a gun to your head and ask you to be involved in any of these things?" White responded, "Her authority is enough in itself." *Id.* at 96. He emphasized that because "[s]he's a guard [and] I'm an inmate.... her power play[ed] a role." *Id.*[6]

---

**6.** The Court also notes that Ottinger testified that White was concerned about his state parole. According to Ottinger, White "wanted to do anything and everything to get out of this trouble[,] to not hurt his State parole." Ottinger Dep. 23. Ottinger further testified that White revealed Mayfield's letters in an effort "to clear his name." *Id.*

The Court concludes that the sum of this evidence supports White's claim that the relationship between White and Mayfield was not consensual, although there is evidence to the contrary. For example, White admitted, "I did like it [the oral sex]. Doesn't mean that it's right, though.... [T]hat doesn't mean that it's okay." *Id.* at 24–25. White also testified that he found "[t]he act itself" to be "pleasurable." *Id.* at 95. In addition, at the preliminary hearing for Mayfield's criminal trial, White testified that he once put his fingers in Mayfield's vagina, Pl.Ex. N, "Preliminary Hearing Testimony of Gene White"; White Dep. 111, which defendants argue is evidence of a consensual sexual relationship. Moreover, White never explicitly told Mayfield, "Please don't do this," *id.* at 19, and he did not formally request a job change. *Id.* at 23, 89, 116–18.

Drawing all reasonable inferences in favor of the plaintiff, the Court concludes that there is evidence in the record which supports White's allegations about Mayfield's assaults; these assaults are, objectively, sufficiently serious to constitute an Eighth Amendment violation. *Farmer v. Brennan,* 511 U.S. at 834, 114 S.Ct. 1970. The Court rejects defendants' position that, based on the current state of the record, White did not suffer an Eighth Amendment violation. To the contrary, the parties have raised a genuine issue of material fact on the first requirement of White's Eighth Amendment claim.

The Court next turns to the question of whether Algarin, Ottinger, and Roth were deliberately indifferent to the substantial risk of serious harm that Mayfield allegedly posed to White, and whether the defendants' deliberate indifference may have violated White's Eighth Amendment rights. *Farmer v. Brennan,* 511 U.S. at 828, 114 S.Ct. 1970. White asserts that although the defendants knew of White's sexual proclivities, they placed her in a position of supervising young male inmates, which created a substantial likelihood of serious harm to them. The defendants deny that they were concerned, or should have been concerned, about Mayfield supervising male inmates, such as White. Algarin Dep. 108–109.

■ In *Farmer v. Brennan,* the Supreme Court explained that "[f]or a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of harm," and that prison officials had a "state of mind ... of 'deliberate indifference' to inmate health or safety." *Id.* at 834, 114 S.Ct. 1970. In other words, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety"; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* at 837, 114 S.Ct. 1970.

■ White argues that Algarin, Ottinger, and Roth were aware of Mayfield's history of sexually molesting young male inmates, but chose not to investigate the situation or take any preventative measures. The Court must now determine whether there is evidence to support White's allegations against each defendant.

First, Roth testified that he has been a prison warden since 1970, and the Warden at MCCF since 1986. Pl.Ex. E, Roth Dep. 4. He describes his duties as being "in charge of every level of the institution." *Id.* In 1993 or 1994, an inmate named Clifton Glenn contacted the warden after his release from MCCF and accused Mayfield of sexual abuse. Def. Mem. 13. Although the record does not specify wheth-

er Mr. Glenn contacted Roth directly, the Court concludes that, at this stage of the proceedings, there is a genuine issue of material fact as to whether Roth had knowledge of Mr. Glenn's complaints against Mayfield. In addition, Roth admitted that he was made aware of the inappropriate letters that Mayfield wrote to White. Roth Dep. 15. Roth agreed that such contact between a correctional officer and an inmate was inappropriate, but he never investigated the situation nor spoke with Mayfield about the letters. *Id.* Roth also conceded that he did not initiate an investigation into Mayfield's alleged criminal conduct, and he had no personal involvement in the criminal investigation against her. *Id.* at 31. *Id.* at 31. This evidence raises a genuine issue of material fact as to whether Roth had a sufficiently culpable state of mind to violate White's Eighth and Fourteenth Amendment rights. Thus, the Court denies defendants' motion for summary judgment on Count Four with respect to Roth.

Next, the Court examines the evidence against Algarin, the Deputy Warden at MCCF who was the "number two man in charge of the prison," reporting only to Roth. Algarin Dep. 7. Algarin's responsibilities included "the employee matters, discipline, hiring, training, the operations of the prison facility itself, the emergency procedures, SOP manual, which is the standard operating procedures, updating, changing, emergencies, just daily operations, inventory control, maintenance department." *Id.* at 9. Algarin was aware that Mayfield had a sexual relationship with a former inmate, in violation of county rules and policies governing the conduct of correctional officers. Although Mayfield reported this relationship to Algarin after the former inmate stole her gun, Algarin did not take any disciplinary action against her. *Id.* at 105–108. In addition, Algarin admitted that he "may have" had a role in

placing Mayfield in a supervisory capacity in the commissary, although he did not believe that she was capable of supervising and despite "an accountability problem, an inventory problem, [and] someone stealing out of the commissary." *Id.* at 47, 65. He was also was "[p]ossibly" aware that certain inmates had more commissary items than they were entitled to when Mayfield supervised the commissary. *Id.* at 98–100. Algarin conceded that he never confronted Mayfield by stating, "I have received statements from inmates wherein those inmates detail or state that Eileen Mayfield gave things from the commissary to them." *Id.* at 69.

Algarin learned of Mayfield's letters to White very soon after White turned them over to Ottinger because "[a]ll misconducts come to [him] first." *Id.* at 15. Algarin held an employee conference with Mayfield to ask her about the letters. She described the letters as "a fantasy, that nothing happened, that it was just a letter." *Id.* at 25. Algarin admitted that at the meeting, he did not confront Mayfield with the statement that "Gene White is saying he had had sex with you," and he did not ask about the specific details of her relationship with White. *Id.* at 44. Instead, Algarin testified that he believed Mayfield's statements, that he did not "investigate *any* of the allegations," and that he "had no conversation with Mr. White." *Id.* at 41 (emphasis added), 43, 44, 76. The Court concludes that the sum of this evidence raises a genuine issue of material fact as to whether Algarin had a sufficiently culpable state of mind to violate White's Eighth and Fourteenth Amendment rights. Accordingly, the Court denies defendants' motion for summary judgment on Count Four with respect to Algarin.

Finally, the Court examines the evidence against Ottinger. Ottinger admitted that he intentionally did not investigate the

extent of Mayfield's sexual misconduct, although he had "concerns ... about an inappropriate relationship with a staff member [Mayfield] and an inmate [White]." *Id.* at 24. Specifically, Ottinger testified that after White turned over Mayfield's letters, Ottinger purposely did not ask White whether he had a physical or intimate relationship with Mayfield. Ottinger Dep. 38. Instead, he simply let his supervisors handle the situation because he knew it was important not to let the incident reach the County detective. *Id.* He explains:

> I purposely did not ask [about the relationship between White and Mayfield] because I didn't know where it would go. I didn't want to tamper or taint anything. It was a very sensitive situation. *I didn't know if it could go to the County detective, and I know not to do that.* It was something big, ... that should be dealt with above and beyond my authority. So I purposely didn't ask [White] anything. That's why I brought it to my bosses to get guidance and see how they wanted to handle it.

Ottinger Dep. 38 (emphasis added). This evidence raises a genuine issue of material fact as to whether Ottinger had a sufficiently culpable state of mind to violate White's Eighth and Fourteenth Amendment rights. Accordingly, the Court denies defendants' motion for summary judgment on Count Four with respect to Ottinger.

In sum, the Court concludes that there are genuine issues of material fact as to both requirements of White's Eighth Amendment claim—that the deprivation alleged is, objectively, sufficiently serious, and Algarin, Ottinger and Roth had a sufficiently culpable state of mind. Thus, the Court denies defendants' motion for summary judgment on Count Four.

### 4. Count Four: White's 42 U.S.C. § 1985 Claim

In Count Four, White seeks redress under 42 U.S.C. § 1985 on the ground that Algarin, Ottinger, and Roth conspired to deprive him of equal protection of the law, and equal privileges and immunities under the law. White specifically alleges that Algarin, Ottinger, and Roth undertook the following overt acts in furtherance of the conspiracy: "not properly investigating Plaintiff's allegations, condoning the conduct of the Defendant, Mayfield, requiring the Plaintiff to serve a full 30 days in solitary confinement[,] and failing to remove the offense from Plaintiff's 'prison jacket.'" Complaint ¶ 13. White does not specify the provision of § 1985 under which he seeks redress. Accordingly, the Court examines each provision of § 1985 in turn to determine whether White can succeed on this claim.

First, § 1985(1) outlaws conspiracies that prevent an officer from performing her duties; this provision is not remotely relevant to White's claims. Second, § 1985(2) makes it unlawful to conspire to obstruct justice, and intimidate a party, witness, or juror in federal court. White's allegations do not suggest that Algarin, Ottinger, and Roth conspired to obstruct justice or intimidate a party, witness, or juror in federal court, so he cannot succeed on a claim under § 1985(2). Third, § 1985(3) prohibits conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). To state a claim under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class-based discriminatory animus designed to deprive, directly, or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and

(4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (citations omitted). White's Complaint does not allege that the defendants' actions were motivated by a racial or class-based animus, and there is no evidence of any such animus. For these reasons, it is clear that White cannot succeed on his § 1985 claim. Therefore, the Court grants the defendants' motion for summary judgment on Count Four.

## 5. Count Five: White's Intentional Infliction of Emotional Distress Claim

In Count Five, White alleges that because Algarin, Ottinger, and Roth knew or should have known of the likelihood of Mayfield assaulting White, they intended to inflict emotional distress on him.

 The elements of an intentional infliction of emotional distress claim are (1) extreme and outrageous conduct (2) that intentionally or recklessly (3) causes emotional distress (4) which must be severe. *See, e.g., Hoy v. Angelone,* 456 Pa.Super. 596, 610, 691 A.2d 476 (1997). As discussed in Part VI.C.3, *supra,* there is conflicting evidence on the issue of whether Algarin, Ottinger, and Roth knew, or should have known, that Mayfield was likely to sexually assault White. Such evidence bears on the first element of the claim—the outrageousness of defendants' conduct.

 Based on the current state of the record, and drawing all reasonable inferences in favor of White, the Court concludes that White has raised a genuine issue of material fact as to each element of his intentional infliction of emotional distress claim. Therefore, the Court denies defendants' motion for summary judgment on intentional infliction of emotional distress.

## 6. Count Eight: White's False Imprisonment Claim

 In Count Eight, White alleges that he was detained illegally and against his will for thirty days in solitary confinement and for an additional seven months at MCCF, due to the actions of Ottinger, Algarin, and Roth.

The elements of a false imprisonment claim are (1) the detention of a person, and (2) the unlawfulness of such detention. *Renk v. Pittsburgh,* 537 Pa. 68, 641 A.2d 289, 293 (1994). White's claim is—again—based on the defendants' failure to remove from his prison jacket the internal charges for stealing boxer shorts and lying to a correctional officer. As discussed in Part VI.C.1, *supra,* White admitted guilt as to the charges that resulted in his placement in solitary confinement, and he had no right to have the internal charges removed from his prison jacket. As a result, White cannot establish a false imprisonment claim. Accordingly, the Court grants defendants' motion for summary judgment on Count Eight.

## VII. CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of Montgomery County and the Montgomery County Prison Board on Counts One, Two, and Three. The Court also grants summary judgment in favor of Algarin, Ottinger, and Roth on Counts One, Two, Four, and Eight. The Court denies defendants' summary judgment motion as to Counts Three and Five.

These rulings leave for trial the claims alleged in Counts Three (violations of White's Eighth and Fourteenth Amendment rights) and Five (intentional infliction of emotional distress).

An appropriate order follows.

# 252

## ORDER

**AND NOW**, this 9th day of August, 2006, upon consideration of the Motion for Summary Judgment of Defendants, Captain Albert Ottinger, Julio M. Algarin, Deputy Warden, Lawrence V. Roth, Jr., Warden, Montgomery County Prison Board, and Montgomery County (Document No. 32, filed May 15, 2006), the Plaintiff's Response to the Motion for Summary Judgment of Defendants Ottinger, Algarin, Roth, Montgomery County Prison Board and Montgomery County (Document No. 35, filed June 8, 2006), and the Plaintiff's Memorandum of Law in Opposition of Motion for Summary Judgment of Defendants Ottinger, Algarin, Roth, Montgomery County Prison Board and Montgomery County (Document No. 36, filed June 8, 2006), **IT IS ORDERED** that the Motion for Summary Judgment of Defendants, Captain Albert Ottinger, Julio M. Algarin, Deputy Warden, Lawrence V. Roth, Jr., Warden, Montgomery County Prison Board, and Montgomery County is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. The Motion for Summary Judgment is **GRANTED** on all of plaintiff's claims against Montgomery County and the Montgomery County Prison Board.

2. The Motion for Summary Judgment is **GRANTED** on Counts One, Two, Four, and Eight of the Complaint in favor of defendants Julio M. Algarin ("Algarin"), Albert Ottinger ("Ottinger"), and Lawrence v. Roth, Jr. ("Roth").

3. The Motion for Summary Judgment is **DENIED** on Counts Three (Eighth and Fourteenth Amendment claims)

and Five (intentional infliction of emotional distress claim).[1]

**IT IS FURTHER ORDERED** that the caption of the case is **AMENDED** to **DELETE** Montgomery County and the Montgomery County Prison Board as defendants.

---

**1.** This ruling leaves for trial the claims alleged in Counts Three (violations of White's Eighth and Fourteenth Amendment rights) and Five (intentional infliction of emotional distress claim).